A. Melvin McDonald, Bar #002298
Linda K. Tivorsak, Bar #024789
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1700
Fax: (602) 200-7847
mmcdonald@jshfirm.com
ltivorsak@jshfirm.com

Mark D. Goldman
GOLDMAN & ZWILLINGER PLLC
17851 North 85th Street, Suite 175
Scottsdale, AZ 85255
Telephone: 480-626-8483
Fax: 480-502-7500
docket@gzlawoffice.com

Attorneys for Defendant Joseph M. Arpaio

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | NO. 2:16-CR-01012-SRB |
| Plaintiff, | **Defendant Arpaio's Motion To Clarify Background And History Of The "Civil Contempt" Admission** |
| v. | |
| Joseph M. Arpaio, Steven R. Bailey, Michelle Iafrate, and Gerard Sheridan, | |
| Defendants. | |

Defendant Joseph M. Arpaio, by and through undersigned counsel, respectfully requests the Court not consider his agreement for a finding of civil contempt in *Melendres et al. vs. Arpaio et al.*, case number CV07-2513-PHX-GMS from the United States District Court, District of Arizona. Evidence of Defendant Arpaio's admission of <u>civil</u> contempt is not relevant and includes issues that go far beyond the referral in this case for criminal contempt. There are three different grounds for providing this clarification.

One, as this Court is aware, civil contempt is based upon a different burden

5725798.1

than criminal contempt. Two, Defendant Arpaio's admission to civil contempt was based upon three different grounds; however, Judge Murray Snow, in referring this case for criminal prosecution, only cites to one of the three. The civil contempt allegations do not parallel the criminal charges. As a result, the argument or contention that the admission is related or connected to a "willful disobedience" of Judge Snow's preliminary injunction is misleading. Finally, the language of the criminal charge as set forth in the Order to Show Cause is specific—for the Court to determine whether Joseph M. Arpaio "should be held in criminal contempt for *willful disobedience* of Judge Snow's preliminary injunction of December 23, 2011." (Emphasis added.) *See* Doc. 36, Order to Show Cause—which focuses largely on Defendant Arpaio's intent and state of mind, not whether his office (Maricopa County Sheriff's Office) did, or did not carry out Judge Snow's order.

I.   **RELEVANT FACTS.**

On or about January 25, 2017, there was a hearing in this case to focus on the current status and furtherance of this case, including a trial setting discussion. During that hearing, the Court raised the question of whether there can be a distinction between "criminally contemptuous" and "contemptuous," and cited to Defendant Arpaio's prior admission of civil contempt in the *Melendres* litigation. **See Exhibit 1, attached.** Undersigned counsel acknowledged to the Court that Defendant Arpaio admitted to "civil" contempt, and not "criminal" contempt, and the Court recognized and further acknowledged the distinction between the two. The Court then questioned whether the admission of civil contempt was related to whether the acts were "intentional" and "criminal in nature."

At trial, it is anticipated that the Government, may present evidence or arguments related to Defendant Arpaio's prior admission of civil contempt on April 23, 2015**. See Exhibit 2, attached**. On that date, the Court asked Defendant Arpaio about "three separate matters that related to civil contempt"—(1) a violation of Judge Snow's preliminary injunction; (2) failure to provide requested materials in the underlying *Melendres* trial; and (3) failure to comply with the Court's order to preserve and produce

materials to the Monitor. *Id.* Defendant Arpaio admitted to all of three areas of civil contempt on the basis that he ran, and was in charge of the Maricopa County Sheriff's Office, and therefore, it was his responsibility to ensure compliance with the order and that was not done. *Id.* Conversely, unlike the civil contempt admission, the Order to Show Cause refers only to one issue—whether there was "willful disobedience of Judge Snow's preliminary injunction of December 23, 2011." *See* Doc. 36.

II. **ARPAIO'S CIVIL CONTEMPT ADMISSION AND THE *MELENDRES* COURT'S FINDING OF CIVIL CONTEMPT SHOULD NOT BE CONSIDERED IN THIS ACTION.[1]**

   A. **Defendant Arpaio's admission of civil contempt and the *Melendres* Court's finding of civil contempt is irrelevant to the determination of criminal contempt.**

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401. The court may exclude relevant evidence if its probative value is substantially outweighed by unfair prejudice, confusion, or the evidence would be misleading. *See* Fed. R. Evid. 403.

Here, an admission or finding of civil contempt is entirely irrelevant to whether an individual is in criminal contempt of court. This Court is required to determine whether there is proof, *beyond a reasonable doubt* that Defendant Arpaio willfully disobeyed the December 23, 2011 preliminary injunction. Importantly, "[i]ntent is irrelevant to a finding of civil contempt." *Stone v. City & Cty. of S.F.*, 1992 U.S. App. LEXIS 15374, at 18 (9th Cir. 1992), *citing McComb v. Jacksonville Paper Co.*, 336 U.S.

---

[1] As a threshold matter, Defendant Arpaio is cognizant of the Court's admonition to the parties not to file any pretrial Motions in Limine. However, this Motion is not intended to limit evidence or testimony presented during trial, rather, it is intended preclude introduction of testimony and evidence prior to trial. Moreover, although the concerns of the rules of evidence are relaxed in a bench trial context, they are not eliminated. *See U.S. Sec. & Exch. Comm'n v. Jensen,* 835 F.3d 1100, 1116 (9th Cir. 2016) (recognizing "a clear risk of unfair prejudice" in the context of a bench trial under Rule 403). Finally, should the Court determine that this Motion is improper, Defendant Arpaio submits that the Court should considered it as bench memo for the Court's consideration to the objection that will be raised at trial toward any evident regarding an admission of civil contempt during the *Melendres v. Penzone* case during trial.

1  187, 191, 69 S. Ct. 497, 499, 93 L. Ed. 599 (1949), *see also N.L.R.B. v. Ironworkers Local*
2  *433*, 169 F.3d 1217, 1222 (9th Cir. 1999) ("because the purpose of civil contempt is
3  remedial, it matters not with what intent the defendant did the prohibited act") (internal
4  quotes omitted).   That determination stands in stark contrast to the requirements of a
5  finding of civil contempt. *See Inst. of Cetacean Research v. Sea Shepherd Conservation
6  Soc'y.*, 774 F.3d 935, 945 (9th Cir. 2014) ("Civil contempt . . . consists of a party's
7  ***disobedience*** to a specific and definite court order by ***failure to take all reasonable steps
8  within the party's power*** to comply.") (emphasis added). Moreover, "[t]he party alleging
9  civil contempt must demonstrate that the alleged contemnor violated the court's order by
10 'clear and convincing evidence", not proof beyond a reasonable doubt.  *Id.*

11         Accordingly, the fact that Defendant Arpaio admitted, on behalf of his
12 (former) office, that there was non-compliance does not make it more or less probable that
13 he *willfully disobeyed* Judge Snow's order.  Moreover, for the same reasons, the Court's
14 finding of contempt against Defendant Arpaio is equally irrelevant.  His admission simply
15 acknowledges that there were mistakes made by his (former) office, and as the head of
16 that office, he was taking responsibility for those mistakes.  This is much different that
17 determining whether he, Defendant Arpaio himself, intended to "willfully" violate the
18 Court's order.   As a result, Defendant Arpaio's admission of civil contempt does not
19 make it more or less probable that he committed criminal contempt and therefore, should
20 not be considered.

21         In addition, as set forth above, there were three bases upon which Defendant
22 Arpaio admitted to civil contempt.  Only one of these three is relevant for criminal
23 contempt.  This Court should not consider, and the Government should not be able to
24 argue, that admitting contempt on three different grounds, two of which are related to
25 discovery in the trial, is somehow related, in any way, to Defendant Arpaio's intent or
26 state of mind when it came to his knowledge about, and compliance with, the
27 December 23, 2011 injunction.  Because the testimony is misleading and does not
28 accurately reflect the charge set forth in the Order to Show Cause, the Court should

preclude testimony related to Defendant Arpaio's prior admission of civil contempt. *See* Fed. R. Evid. 403.

### B. Consideration of Defendant Arpaio's admission of civil contempt and the *Melendres* Court's finding of civil contempt is unfairly prejudicial to the determination of criminal contempt in this action.

Finally, admitting evidence of Defendant Arpaio's civil contempt admission would be unfairly prejudicial. Defendant Arpaio has a Fifth Amendment right not to testify in his criminal contempt case. Allowing the Government to present evidence to the Court about his prior admission of civil contempt would essentially force him to explain why he decided to admit to civil contempt and what his intention was in doing the same. In addition, it reduces the burden on the Government from having to prove their case—instead of presenting evidence showing *how* Defendant Arpaio willfully disobeyed the Court's order, the Government can now use testimony from a prior court proceeding, that relies on a different burden of proof, to argue that Defendant Arpaio's admission on one is evidence of his guilt on the second. This is an improper conclusion. As a result, because testimony or evidence related to Defendant Arpaio's civil contempt is misleading, prejudicial, confusing, and unfairly shifts the burden to the defense, it should be precluded under Rules 401 and 403.

## III. CONCLUSION.

Based upon the foregoing, Defendant Arpaio moves to preclude any evidence that he previously admitted to civil contempt or the *Melendres* Court's finding of civil contempt because it is irrelevant, prejudicial, misleading, and confusing.

RESPECTFULLY SUBMITTED this 24th day of March, 2017.

JONES, SKELTON & HOCHULI, P.L.C.

By /s/ A. Melvin McDonald
　　A. Melvin McDonald
　　Linda K. Tivorsak

GOLDMAN & ZWILLINGER PLLC
　　Mark D. Goldman

Attorneys for Defendant Joseph M. Arpaio

5725798.1

5

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of March 2017, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

/s/ Diana Weeks

Case 2:16-cr-01012-SRB   Document 102   Filed 03/24/17   Page 7 of 19
16

CR16-01012-01-PHX-SRB      PRETRIAL CONFERENCE   1-25-17

1  disobeyed or didn't follow his own rules, and thereafter,
2  makes the referral, I think those are facts that could be
3  considered in deciding whether or not the actions were
4  contemptuous.
5             In other words, one possibility --
6             THE COURT:  Well, can we distinguish between
7  "criminally contemptuous" and "contemptuous," because my
8  understanding is -- and I could be wrong, because I certainly
9  have not studied the case before Judge Snow other than to read
10 his order that referred this matter to me -- is that as it
11 related to the preliminary injunction, that there was an
12 admission of contempt.
13            MR. McDONALD:  Civil contempt.
14            THE COURT:  That's why I said I want to distinguish
15 between "criminal" and "civil."
16            MR. McDONALD:  Correct.
17            THE COURT:  Because there was an admission of civil
18 contempt.  There's no question but that there was a civil
19 contempt of the preliminary injunction by Sheriff Arpaio.
20            MR. McDONALD:  Correct.
21            THE COURT:  He admitted it.
22            MR. McDONALD:  Yes.
23            THE COURT:  And now the only issue is whether or not
24 it goes over to being intentional and is criminal in nature as
25 well.

EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, et al., | ) ) ) | |
| Plaintiffs, | ) ) | CV 07-2513-PHX-GMS |
| vs. | ) ) ) | Phoenix, Arizona<br>April 23, 2015 |
| Joseph M. Arpaio, et al., | ) ) | 8:34 a.m. |
| Defendants. | ) ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE G. MURRAY SNOW

(Evidentiary Hearing Day 3, pages 512-817)

Court Reporter:        Gary Moll
                       401 W. Washington Street, SPC #38
                       Phoenix, Arizona  85003
                       (602) 322-7263

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

EXHIBIT 2

1                          EXAMINATION

2   BY THE COURT:

3   Q.  I do appreciate that you have indicated that you have

4   respect for the federal court and for judges.  I assume that I

5   was intended to be included among that group when you said it?

6   A.  Yes, sir.

7   Q.  I want you to know that while we have disagreements, and I

8   think some sharp ones in the past, I respect you in your

9   position as the sheriff of Maricopa County, and recognize that

10  you have been elected by the people of this county and I want

11  to afford you that same respect.

12             So I'm going to have some questions, some of them may

13  be difficult to answer, and I'm going to certainly let your

14  attorneys participate if they have concerns, but I'm going to

15  try to ask you my questions with respect, and I hope you'll

16  afford me the same in response.

17  A.  Yes, sir.

18  Q.  Now, we began by discussing -- or you began your

19  testimony -- I can't even remember whether it was this morning

20  or last night -- by discussing the scope of the matters that

21  you had -- in which you admit that you're in civil contempt.

22  And there were actually three matters that I specified in my

23  order to show cause.

24             Do you remember those?  Do you remember what they

25  were?  Three separate matters that related to civil contempt.

1  And the first was the violation of my preliminary injunction.

2  A.  Yes.

3  Q.  And do you admit that you're in civil contempt of that

4  order?

5  A.  Yes.

6  Q.  And the second was I discussed all of the documents,

7  videos, other things, that were requested prior to the

8  underlying trial of this matter that were not -- that were

9  apparently not provided by the MCSO.  And in that one I said

10 that it was in contempt of court rules, and that in addition to

11 the contempt authority, it also -- the Court had power to make

12 remedies based on its own inherent authority and for the

13 violation of court rules.

14          So I'm going to ask the first one, first question:  Do

15 you admit that you are in contempt for your failure to provide

16 requested materials prior to the underlying trial of this

17 matter?

18          MS. IAFRATE:  Your Honor, may I object just as to the

19 way that the question is worded?  Could we include civil

20 contempt?

21          THE COURT:  Surely.

22          MS. IAFRATE:  Thank you.

23 BY THE COURT:

24 Q.  I'll amend that to include civil contempt.

25 A.  Your Honor, I run this organization.  I'm really not

1  involved in that situation, but I'm still in charge of this
2  organization, so I take responsibility.
3  Q.  And does that mean that you admit that you're in civil
4  contempt for the failure to provide the requested documents and
5  other materials prior to trial?
6  A.  On the -- on what I said, I am in charge of this
7  organization and take responsibility.
8  Q.  Does that mean yes, that you admit that you are in civil
9  contempt?
10 A.  Yes.
11 Q.  All right.  And do you recognize that I also have inherent
12 authority, and are you conceding that, to create remedies for
13 that violation, even to the extent that contempt is not an
14 issue, but your violation of the court rules?
15         That's a poor question.
16         Do you also admit that you are in violation of court
17 rules that would have required you to produce those documents
18 and those materials prior to trial?
19 A.  Yes, because I'm responsible for the organization.
20 Q.  Okay.  And do you acknowledge that I have that the
21 authority to make remedies for that violation?
22 A.  Yes, sir.
23 Q.  Let me just ask a few questions about this.  I don't want
24 to ask a lot of questions about things that you're going to
25 admit to, but I have a few questions both about the preliminary

1   injunction, just to clarify, and then I have just a few about
2   the documents and other materials that were requested.
3           I will tell you that in -- there's been a lot of paper
4   in this matter. It's gone on for years. In some of the recent
5   paper that's gone across my desk in discovery disputes I have
6   seen responses to interrogatories served, I think, by
7   Chief Sands, but it might have been by the plaintiffs, in which
8   Mr. Casey provided his time records, and indicated that he
9   spoke with you, I think about -- he specified about this
10  preliminary injunction order, on December 26th, 2011, so that
11  must have been before you left town.
12          Do you have any recollection discussing the
3   preliminary injunction order with Mr. Casey on December 26,
14  2011?
15  A.  Your Honor, I was on an airplane, I think 10:00 in the
16  morning heading to Iowa. I don't recall speaking with him.
17  Q.  You don't recall a call from him, you just don't think you
18  had any communication with him on that date?
19  A.  I don't recall.
20  Q.  All right. Now, with respect to the failure to -- I mean,
21  does it strike you that it's a pretty big deal to not comply
22  with my preliminary injunction for 18 months?
23  A.  Yes, sir.
24  Q.  And if you delegated this to somebody, have you taken any
25  actions to hold anyone responsible?

1  A.  Not -- no, no, sir.

2  Q.  With respect to the documents, do you have any idea if your

3  department has any policies whatsoever about how to go about

4  retrieving materials that have been requested in litigation?

5  A.  I don't know the mechanics, but I do know there's been a

6  lot of work, a lot of personnel, trying to abide by your order

7  to get those documents.

8  Q.  I have a different question, and that is:  Do you have any

9  policies in your office that guide employees about how they

10  should go about responding to requests for materials and

11  documents in litigation?

12  A.  I don't know.  I may not have, but we're still going to --

13  we're going to be doing it and do a lot of corrections.

14  Q.  Now, you've heard testimony, I think from the paralegal in

15  this matter, at least, that there were a whole lot of documents

16  that were turned over that would have been responsive, and it

17  appears to me that there's been other testimony that other

18  recordings existed that may -- recordings and other documents

19  existed that may have been destroyed.  And you recognize that

20  that's a pretty serious problem, don't you?

21  A.  Yes, sir.

22  Q.  And you do, as the sheriff's office, have a responsibility

23  to the public to let them know what your operations are.

24  A.  Yes.

25  Q.  And if in fact -- it's inevitable that any sheriff's going

1  to get sued. I have suits in front of me that name you all the
2  time. And that doesn't necessarily mean you're responsible,
3  but you get sued, and it's -- it's very important for your
4  office to be open and to respond in a responsible way to
5  litigation requests. You recognize that?
6  A. Yes, sir.
7  Q. Now, the third matter that I ordered up contempt on was
8  about the May 14th hearing. And in that hearing you did appear
9  in front of me, so did Deputy Chief Sheridan. He did most of
10 the talking, but to his credit, to the credit of your
11 department, you brought forward some very disturbing facts that
12 you became aware of as a result Deputy Armendariz -- a search
13 of Deputy Armendariz's home after his decease.
14          Do you remember that?
15 A. Yes.
16 Q. And you remember that during that hearing you actually
17 played for me a number of stops that were videotaped by Deputy
18 Armendariz that I think you car -- and when I say "you," I
19 don't mean you personally, but in that hearing you
20 characterized for me as problematic stops.
21          Do you recall that?
22 A. Did I personally, or --
23 Q. Do you recall that happening here?
24 A. I believe so, yes.
25 Q. All right. And do you recall that in one of those

1  problematic stops I asked if there were any supervisors that
2  appeared to have been present while Deputy Armendariz was
3  engaging in problematic behavior. And do you recall that I was
4  told that Lieutenant Sousa was present during one of those
5  stops?
6  A.  I don't recall, but --
7  Q.  That's all right. If you don't recall, you don't recall.
8      And do you remember then that I had a colloquy with
9  Chief Deputy Sheridan about how it would be much more desirable
10 to quietly collect videotapes and audiotapes, because if
11 officers were engaged in misbehavior, they weren't going to
12 voluntarily turn them over if they knew that they had
13 videotapes that showed them in misbehavior.
14     Do you remember that?
15 A.  Your Honor, I believe what happened, but I'm not sure --
16 Q.  If you don't remember --
17 A.  -- if I was there.
18 Q.  Oh, you were there.
19 A.  Did I see the videos and so on?
20 Q.  We've got a transcript.
21 A.  Yeah.
22 Q.  I'm just asking if you remember, and if you don't remember,
23 you don't have to --
24 A.  But I believe what you're saying.
25 Q.  Then I called you up. Do you remember that?

1  A.  Yes.
2  Q.  And you reviewed some of that with Mr. Young, but a part
3  you didn't review is you indicate that you delegate all that to
4  Chief Deputy Sheridan.  And you may not have said him directly,
5  but I think you did say him directly.
6      Do you remember doing that?
7  A.  Yes.
8  Q.  And do you remember that my response to you was that I
9  understood that somebody in your position had to delegate
10 things to people they could trust, but that didn't change the
11 fact that you were the party to this lawsuit and that you were
12 responsible to see that your department engaged in responsible
13 behavior and I would hold you responsible.
14     Do you remember that?
15 A.  Yes.
16 Q.  And I expected you to set the proper tone and you told me
17 you would.
18     Do you remember that?
19 A.  Yes.
20 Q.  Would you agree that the tone that you set in responding to
21 the Court's orders is very important?
22 A.  Yes.
23 Q.  And you would agree, without me having to review it with
24 you, that I was very disappointed, up until that point, in some
25 of the statements that you, Chief Deputy Sheridan,

1    Chief Trombi, and others, had said that were just flat
2    misstatements of my court rulings.
3            Do you recall that?
4    A.   Yes.
5    Q.   And so I'm very interested in tone. Would you agree that
6    tone is very important going forward?
7    A.   Yes.
8    Q.   Now, in the May 14 hearing do you recall what Chief Deputy
9    Sheridan -- or in the May 14 meeting that you had after --
10   immediately after this hearing, do you recall what Chief Deputy
11   Sheridan said to Chief Trombi?
12   A.   I believe he wanted to do something right away pursuant to
13   your order and --
14   Q.   And you didn't ever stop him and say: Wait. We're going
15   to review this with the monitor?
16   A.   No.
17   Q.   Did you ever discipline Chief Deputy Sheridan or
18   Chief Trombi for violating my orders?
19   A.   No, sir.
20   Q.   Do you admit that you are in contempt for what happened on
21   May 14th in violating my orders? Civil contempt.
22   A.   On the Trombi situation?
23   Q.   Yes. In other words, sending out the e-mail to all of the
24   MCSO informing them, when I had asked you and instructed you to
25   quietly correct them after having formulated a plan with the

1  monitor.

2        Do you agree that you're in contempt, civil contempt,

3  for that?

4  A. I have all the information on it. I was in the room and

5  they made a decision how to retrieve the evidence.

6  Q. Let me tell you why I'm asking.

7  A. Yeah.

8  Q. I'm going to have to make legal rulings, and I've ordered

9  up several matters for contempt, and one of them is that you

10 and the chief deputies, Trombi, are in civil -- the allegation

11 is that you're in civil contempt for failing to abide my -- or

12 abide my instructions that I gave you that morning.

13       And so I just want to know, do you acknowledge that

14 you are in civil contempt for that order, or am I going to need

15 to make a determination regarding it?

16 A. If you're saying I did not speak up when they --

17 Q. Well --

18 A. -- did the procedure to order the evidence?

19 Q. I'm just saying for what you did and failed to do in the

20 meeting that violated my instructions, do you admit you're in

21 contempt or not? I just want to understand.

22 A. Well, if I do admit, it wasn't intentional.

23 Q. All right. Again, I'm only talking about civil contempt,

24 and civil contempt does not mean that you had an intent to

25 violate my order, but it does mean that you didn't take

1  reasonable steps to enforce my order.

2          Do you admit under that guideline that you are in
3  contempt for failing to -- to abide by the May 14th hearing
4  instructions I gave you?
5  A.  I would have to say yes.
6  Q.  All right.  Now, it's important for me to understand when
7  I'm evaluating what kind of relief -- and I am going to give
8  some relief, clearly, to the plaintiff class, and it may be
9  quite extensive or it may be limited.  And it's something that
10 I've got to consider in conjunction with the parties, and I
11 think it's going to require some careful thought.

12         But to me it is very important whether that contempt
13 that you and perhaps Chief Deputy Sheridan -- civil contempt --
14 committed on May 14 was an isolated incident or was a pattern
15 that reflects a hesitancy on the sheriff's office, on the
16 sheriff's department and on your part, or even a desire to
17 subvert the orders of this Court, so I'm going to ask you some
18 more questions about that.

19         Did you -- I may have already asked you.  Did you
20 impose any discipline on Chief Deputy Sheridan for violating my
21 order and giving that direction to Chief Deputy Trombi?
22 A.  No, sir.
23 Q.  Has there been any investigation regarding that?  I know
24 there have been some investigations that my monitor and I have
25 insisted on, and there were a few investigations that were