AnnaLou Tirol
Acting Chief
Public Integrity Section, Criminal Division
U.S. Department of Justice

JOHN D. KELLER
Illinois State Bar No. 6293104
Deputy Chief
VICTOR R. SALGADO
DC Bar No. 975013
SIMON J. CATALDO
Massachusetts Bar No. 690879
Trial Attorneys
Public Integrity Section, Criminal Division
U.S. Department of Justice
1400 New York Ave, NW, 12th floor
Washington, D.C. 20005
Tel: (202) 514-1412
John.Keller2@usdoj.gov
Victor.Salgado@usdoj.gov
Simon.Cataldo@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>            Plaintiff,<br>v.<br>Joseph M. Arpaio,<br>            Defendant. | No. CR-16-01012-PHX-SRB<br><br>**UNITED STATES' TRIAL MEMORANDUM** |

This case arises from the defendant's admitted violations of United States District Judge G. Murray Snow's December 23, 2011, preliminary injunction issued in *Melendres v. Arpaio*, No. 2:07-cv-02513, ECF No. 1094 (D. Ariz. Dec. 23, 2011). Judge Snow ordered the defendant to stop detaining undocumented immigrants on mere suspicion of unlawful presence. The defendant willfully disregarded the Court's directive, despite repeated warnings that such detentions were unlawful. The defendant then boasted about his defiance of federal authority—at a time when he thought there would be no consequences for his actions—to garner publicity and support for his 2012 re-election campaign and to further his image as "America's Toughest Sheriff." The government will

present the testimony of those who personally advised the defendant that continued transfers of suspected undocumented immigrants to U.S. Immigration and Customs Enforcement ("ICE") and U.S. Border Patrol violated the injunction. This testimony, along with the defendant's own admissions, will demonstrate beyond a reasonable doubt that the defendant willfully violated the December 23, 2011, preliminary injunction issued in *Melendres*.

## I. Procedural History

On December 12, 2007, Manuel de Jesus Ortega Melendres filed a class action lawsuit alleging that the defendant, then Sheriff of Maricopa County, and the Maricopa County Sheriff's Office had engaged in racial profiling and had violated Latinos' Fourth Amendment rights by stopping and detaining individuals based purely on suspicion that they were unlawfully present in the country. On December 23, 2011, Judge Snow entered a preliminary injunction enjoining "MCSO and all of its officers from detaining any person based on knowledge, without more, that the person is unlawfully present within the United States." *Melendres*, ECF No. 494 at 38. The injunction further directed that MCSO "may not enforce civil federal immigration law." *Id*. at 39. In July 2012, the *Melendres* claims were litigated at a bench trial before Judge Snow. *Melendres,* Bench Trial Transcripts, ECF Nos. 571–77.

On May 24, 2013, Judge Snow issued Findings of Fact and Conclusions of Law and made the injunction permanent. In April 2015, civil contempt hearings began in *Melendres* regarding potential violations of court orders, including the preliminary injunction. Those hearings were recessed in April and resumed in September, October, and November of 2015. On August 19, 2016, Judge Snow referred the defendant for criminal contempt based on, among other things, his violations of the preliminary injunction. *Melendres*, ECF No. 1792.

On October 25, 2016, this Court issued an Order to Show Cause pursuant to 18 U.S.C. § 401(3) and Federal Rule of Criminal Procedure 42 as to whether the defendant

should be held in criminal contempt for violating Judge Snow's preliminary injunction. *United States v. Arpaio,* No. 2:16-cr-01012, ECF No. 36. On March 1, 2017, this Court granted the government's Motion for a Bench Trial and limited the defendant's potential sentence to a maximum of six months' imprisonment. *Id.*, ECF No. 83.

## II.   The Elements of Contempt and the Government's Anticipated Trial Evidence

18 U.S.C. § 401 provides:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401.

In order to prove criminal contempt under Section 401(3), the government must establish three elements: (1) that there was "a clear and definite order of the court," (2) that "the contemnor kn[ew] of the order," and (3) that "the contemnor willfully disobey[ed] the order." *United States v. Powers*, 629 F.2d 619, 627 (9th Cir. 1980).

### A. Clear and Definite Order

In assessing whether an order is clear and definite, courts and juries consider "the entire background behind the order, including the conduct that the order was meant to enjoin or secure, the interests it was trying to protect, the manner in which it was trying to protect them, and any past violations and warnings." 1-20 Modern Federal Jury Instructions-Criminal ¶ 20.02, cmt. to Instruction 20-13 (citing, *inter alia*, *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007); *United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974)); *see also Chapman v. Pac. Tel. & Tel. Co.*, 613 F.2d 193, 196

1  (9th Cir. 1979) (holding that where judge issued verbal directive followed by a written
2  order, the court's repeated explanations were not "vacillation" and that "the court could
3  have done [nothing more] to clarify and define its order"). Moreover, "[a] defendant may
4  not avoid criminal contempt by twisted interpretations or tortured constructions of the
5  provisions of the order." *Greyhound Corp.*, 508 F.2d at 532 (internal quotation marks
6  omitted).

7         The preliminary injunction provided the following: "MCSO and all of its officers
8  are . . . enjoined from detaining any person based on knowledge, without more, that the
9  person is unlawfully present within the United States." *Melendres*, ECF No. 494 at 38.
10 The injunction further directed that "[d]efendants are therefore enjoined from detaining
11 individuals in order to investigate civil violations of federal immigration law. . . . They are
12 further enjoined from detaining any person based on actual knowledge, without more, that
13 the person is not a legal resident of the United States." *Id.* at 39. Finally, in the last
14 paragraph of the Order, the injunction provided: "MCSO and all of its officers are hereby
15 enjoined from detaining any person based only on knowledge or reasonable belief, without
16 more, that the person is unlawfully present within the United States." *Id.* at 40. The
17 language of the injunction is clear. MCSO was prohibited from detaining any individual
18 based solely on suspicion, or even knowledge, of unlawful presence.

19     **B.  Knowledge of the Order**

20        The second element of criminal contempt requires "knowledge or actual notice of
21 the court order in question." *United States v. Rylander*, 714 F.2d 996, 1003 (9th Cir. 1983)
22 (stating that "actual notice of the order is all that is required; neither formal notice nor
23 personal service is necessary to support a conviction for criminal contempt").

24        The government will present evidence that the defendant was focused on the
25 practice of detaining individuals based on suspected unlawful presence long before the
26 preliminary injunction was issued and that he was well aware when it was issued that it
27 required a change in his practices. The defendant has admitted that he was informed of the
28

1  preliminary injunction shortly after it was issued, that he never forgot about it, that
2  MCSO's immigration enforcement activities violated the preliminary injunction, and that
3  "[d]espite being aware of the preliminary injunction, [he] failed to take steps necessary to
4  ensure that MCSO complied with the preliminary injunction."  Those admissions will be
5  supported by the trial testimony and prior testimony of multiple witnesses, including Tim
6  Casey, Chief John MacIntyre, and Chief Brian Sands, who informed the defendant of the
7  injunction shortly after its issuance, discussed what it prohibited, and warned of MCSO's
8  violations of it.  Moreover, during the seventeen months in which the defendant repeatedly
9  violated the order, he was reminded about its requirements time and again by Casey.
10 Finally, the defendant's own statements in press releases and to the media will demonstrate
11 his knowledge of, and disregard for, the order.

### C. Willful Disobedience

The third element of contempt that the government must prove is whether the defendant willfully disobeyed the order.  The Ninth Circuit defines willfulness in the contempt context as "a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful.  It implies a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order."  *United States v. Armstrong*, 781 F.2d 700, 706 (9th Cir. 1986) (internal quotation marks and citations omitted); *see also United States v. Baker*, 641 F.2d 1311, 1317 (9th Cir. 1981).

"While a Defendant is, of course, not required to seek . . . a clarification [of a court order], a failure to do so when combined with actions based upon a twisted or implausible interpretation of the order will be strong evidence of a willful violation of the decree." *Greyhound*, 508 F.2d at 532.  Willfulness analysis also "properly encompasses the contemnor's behavior in related incidents such as disobedience or resistance to other orders of the court." *Wright v. Nichols*, 80 F.3d 1248, 1252 (8th Cir. 1996) (internal quotation marks omitted).

Further, direction or facilitation of subordinates' noncompliance with a court order

by a supervisor constitutes willful disobedience. *See United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 658–59, 666 (2d Cir. 1989) (affirming conviction under § 401(3) of a branch office manager for instructing her subordinates to violate a consent decree's prohibition of unlawful business practices); *In re Holland Furnace Co.*, 341 F.2d 548, 551–52 (7th Cir. 1965), *aff'd sub nom. Cheff v. Schnackenberg*, 384 U.S. 373 (1966) (affirming contempt conviction of the "dominant head" of a company for "knowingly, willfully and intentionally" causing and aiding and abetting in causing the company to violate a court order, where defendant delegated compliance enforcement to employees he knew would be ineffective in such a role); *United States v. Hochschild*, Nos. 96-3517, 97-3403, 1997 WL 705089, at *1–2 (6th Cir. 1997) (affirming Section 401(3) conviction of company president for failure to bring his business into compliance with an order of the National Labor Relations Board).

It is no defense that the defendant is unaware that his contumacious conduct could result in criminal (rather than civil) liability. *See Armstrong*, 781 F.2d at 707 ("Even if it were true [that the defendants did not understand that their conduct amounted to criminal contempt], it is no defense. The critical inquiry is whether the appellants were aware that they were disobeying a lawful court order."). *Armstrong*'s guidance is directly relevant where here, when asked during a deposition whether obeying court orders fell within his oath of office, the defendant testified that "the contempt situation is not a felony, not a misdemeanor."

Additionally, "while actions showing a good faith effort to comply with the order will tend to negate willfulness, delaying tactics, indifference to the order, or mere paper compliance will support a finding of willfulness," and "[t]he very issuance of the order puts the party on notice that his past acts have been wrongful." *Greyhound Corp.*, 508 F.2d at 532 (internal quotation marks and citations omitted); *accord Rylander*, 714 F.2d at 1003 ("While a good faith effort to comply with the order is a defense to a charge of contempt, delaying tactics or indifference are not.") (internal quotation marks omitted)). Similarly,

belief that an order is invalid does not relieve a defendant of the obligation to obey it. *Chapman*, 613 F.2d at 197.

Finally, a defendant's deliberate ignorance regarding violations of a court order does not negate the willfulness *mens rea* requirement for contempt. *See United States v. Salman*, No. CR-11-0625 EMC, 2013 WL 6655176 at *3 (N.D. Cal. Dec. 17, 2013) ("Defendant's more general argument, which appears to imply that the deliberate ignorance is inconsistent with a *mens rea* requirement of 'willfully' or 'knowingly' cannot be reconciled with the Ninth Circuit's recognition that the substantive justification for the rule is that deliberate ignorance and positive knowledge are equally culpable." (internal quotation marks and citation omitted)); Ninth Circuit Manual of Model Jury Instructions – Criminal, ¶ 5.7 (Deliberate Ignorance) (2010) (stating that a factfinder may find that a defendant acted knowingly if the defendant "1. was aware of a high probability that [continuing to stop and detain individuals based solely on suspicion or knowledge that they were present in the country illegally violated the December 23, 2011, preliminary injunction], and 2. deliberately avoided learning the truth."); *United States v. Yi*, 704 F.3d 800, 805 (9th Cir. 2013) (affirming district court's deliberate ignorance instruction where a rational jury could have inferred that CEO-defendant knew, based on his industry experience, of a high probability that his properties contained asbestos; that he "engaged in a deliberate pattern of failing to read documents that might clarify whether asbestos was in fact present;" and that the jury likewise could have rejected the defendant's "argument that he was very busy, that he trusted all of his subordinates to read everything for him, or even that he was told the insurance company's test had come back 'negative' for asbestos").

The government will present evidence that the defendant willfully disobeyed Judge Snow's preliminary injunction, to include: (1) evidence of the repeated warnings that the defendant received that he was violating the injunction; (2) MCSO press releases touting immigration operations that violated the injunction; (3) MCSO statistics showing the regular and repeated detentions of suspected undocumented immigrants in violation of the

injunction; and (4) the defendant's own statements in court, depositions, and to the media highlighting his violations of the injunction.

The government intends to present evidence regarding the defendant's creation of and control over the MCSO immigration enforcement policies that were affected by the injunction. In 2006, the defendant created the Human Smuggling Unit ("HSU") within MCSO to prioritize immigration enforcement. In 2007, the defendant entered into an agreement with ICE that permitted MCSO to enforce federal immigration law under Section 287(g) of the Immigration & Nationality Act of 1996, which provided ICE training for approximately one hundred MCSO sheriff's deputies in the enforcement of federal immigration law. In October 2009, ICE revoked MCSO's Section 287(g) authority, and the defendant immediately hired consultant Kris Kobach to instruct almost 900 MCSO sworn deputies concerning their "inherent authority" to enforce federal immigration law. On February 8, 2010, the defendant issued a press release announcing the training: "Arpaio says the 881 trained deputies will replace and expand the work done by the 100 deputies whose federal authority granted by the 287(g) program was revoked . . . by the U.S. Department of Homeland Security."

Against this background and context, MCSO witnesses will testify that post-preliminary injunction the defendant knew that his conduct was wrongful and that the continued detentions were deliberate and intended violations. Shortly after Judge Snow issued the December 23, 2011, preliminary injunction, MCSO's outside counsel, Tim Casey, Chief MacIntyre, and Chief Sands explained the import and meaning of the preliminary injunction to the defendant in no uncertain terms: MCSO deputies could no longer detain persons based solely on their suspected immigration status. Casey told the defendant that, pursuant to the preliminary injunction, "there is no transportation whatsoever to the federal authorities." In January 2012, the defendant instructed Casey to appeal the preliminary injunction and on January 13, 2012, the notice of appeal was filed. The preliminary injunction, however, remained in place, and the defendant's sworn

- 8 -

1  deputies continued to enforce federal immigration laws pursuant to the Kobach theory of
2  "inherent authority" that the defendant himself promoted throughout MCSO.

3        The government will also present the defendant's own statements that demonstrate
4  his willfulness.  The defendant admitted in 2015, during his testimony in the *Melendres*
5  evidentiary hearing, that following the issuance of the preliminary injunction, he believed
6  MCSO would need to change its policies to comply.  He nevertheless ordered no changes
7  to MCSO's policy of detaining suspected illegal immigrants in the absence of state charges,
8  and he sought no clarification of the court's order.  Indeed, the defendant viewed his
9  defiance of the federal government's directives on immigration as a badge of honor, and
10  he bragged about his deputies' contemptuous immigration enforcement practices to the
11  press.  On December 30, 2011, the defendant issued a press release with a quote: "I will
12  continue to enforce illegal immigration laws."  On February 9, 2012, a MCSO press release
13  announced another HSU operation, stating: "Sheriff Arpaio continues to crackdown [sic]
14  on immigration and will not be deterred by activist groups and politicians for enforcing all
15  immigration laws."  On March 28, 2012, in announcing additional detentions, the
16  defendant stated through a press release that he "remains adamant about the fact that his
17  office will continue to enforce both state and federal immigration laws as long as the laws
18  are on the books."  The defendant also announced to a national television audience in May
19  and June of 2012 that he was "going to continue to enforce state laws and federal laws"
20  relating to immigration, and that "[i]f they're illegal, okay, they're going to jail. . . . we're
21  going to try to call ICE to take them off our hands."

22        On July 24, 2012, the defendant testified in the *Melendres* trial.  He testified that his
23  office continued to detain suspected undocumented immigrants purely for transport to ICE.
24  Soon after, Casey re-explained to the defendant that "there is no transportation whatsoever
25  to the federal authorities, . . . you cannot hold."  The defendant affirmed his understanding
26  and assured Casey that the violations would end.

27        The government's evidence will also demonstrate that the defendant sought a
28

- 9 -

workaround when ICE refused to accept the transfers, distinguishing his conduct "from an accidental, inadvertent, or negligent violation" of the order. *See Armstrong*, 781 F.2d at 706. On September 21, 2012, MCSO issued a press release stating that for the "first time" ICE had refused to take custody of suspected illegal immigrants that MCSO had detained and was attempting to transfer to ICE, in violation of the preliminary injunction. In the press release, the defendant announced his "backup plan" to "take these illegal immigrants not accepted by ICE to the Border Patrol." On October 11, 2012, the *Melendres* plaintiffs notified MCSO that they had learned of MCSO's recent violations of the preliminary injunction, in part by reading MCSO's September 21, 2012 press release. Casey again met with the defendant and told him that the backup plan violated the preliminary injunction, and that the defendant could not turn persons over to ICE or Border Patrol. The defendant told Casey that he (the defendant) was the sheriff and made the decisions at MCSO. The defendant did, however, tell Casey that the violations of the preliminary injunction would stop. They did not. No change to MCSO's contemptuous immigration enforcement practices followed. The defendant continued to tell the media that he was "trying to help the federal government lock up all the people coming into our County and the United States," and that his "deputies will continue to enforce state and federal laws." MCSO continued to publish in its news releases that it was turning persons over to ICE in the absence of state law charges.

Judge Snow issued a permanent injunction on May 24, 2013, which effectively extended permanently the requirements of the prior December 23, 2011, preliminary injunction. *Melendres*, ECF No. 579 at 141–42. For the seventeen months between the preliminary injunction and the permanent injunction, despite the defendant's intimate knowledge of MCSO's immigration enforcement practices, no changes were ordered within HSU to comply with the preliminary injunction. MCSO's internal records reflect that, between December 23, 2011, and May 24, 2013, MCSO deputies detained and transferred to ICE at least 171 people based solely on suspicion of their unlawful

immigration status, in the absence of any state law charge.

### III. Legal Issues

#### A. Public-Authority Defense

On May 18, 2017, the Defendant filed a "[Federal] Rule [of Criminal Procedure] 12.3 Notice of Public-Authority Defense." ECF No. 145. The Notice stated, in relevant part:

> Even if Defendant committed such acts in willful disobedience of a clear and definite order, and even if such acts were illegal, Defendant and/or the MCSO would have committed such acts at the request of a government agent, or because of a reasonable belief that they were acting as an authorized agent to assist in law enforcement activity at the time, which legally excuses the crime charged.

On June 1, 2017, upon request by the government, the Defendant disclosed a list of eighteen defense witnesses upon whom "the Defendant intends to rely on to establish a public-authority defense." On June 5, 2017, the government in turn disclosed its list of two rebuttal witness concerning the public-authority defense.

The public-authority defense is an affirmative defense. It may be raised where a defendant has knowingly violated a federal criminal law, but has done so in reliance on the affirmative authorization of a government official who had actual authority to authorize the defendant's otherwise-criminal conduct. *See United States v. Alvarado*, 808 F.3d 474, 484, 489 (11th Cir. 2015) (stating the elements of the public-authority defense). Although Rule 12.3 requires the defendant to provide notice of "actual or believed exercise of public authority," the Ninth Circuit has clarified that "the validity of the [public-authority] defense depends upon whether the government agent in fact had the authority to empower the defendant to perform the acts in question." *United States v. Burrows*, 36 F.3d 875, 881 (9th Cir. 1994) (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)). The authorization relied upon must be specific. *See United States v. Doe*, 705 F.3d 1134, 1148 (9th Cir. 2013) (characterizing defendant's public-authority

1  defense as "shaky at best, because he never suggested that he was specifically authorized
2  or directed to carry out these particular crimes"). Moreover, the defendant's reliance on
3  the authorization must be reasonable, meaning "a person sincerely desirous of obeying the
4  law would have accepted the information as true, and would not have been put on notice
5  to make further inquiries." *United States v. Lansing*, 424 F.2d 225, 227 (9th Cir. 1970)
6  (noting that in light of "the ease with which appellant could have inquired . . . he had no
7  privilege to remain in ignorance."). Where, as here, the charged "statute is silent on the
8  question of affirmative defenses and when the affirmative defense does not negate an
9  essential element of the offense," the defendant bears the burden of proving the defense by
10 a preponderance of the evidence. *Doe*, 705 F.3d at 1147 (applying these principles to the
11 public-authority defense) (quotation marks omitted).

12 The government is not aware of a single instance in which a defendant charged with
13 criminal contempt has successfully asserted a public-authority defense. Moreover, the
14 doctrine is inapplicable in this case, as no federal immigration agency possessed actual
15 authority to direct the defendant to violate the order of a federal judge. Any contrary belief
16 would be unreasonable, especially in light of the fact that the defendant knew that MCSO
17 lost its Section 287(g) authority years before Judge Snow issued the preliminary injunction.

18     **B. Evidentiary Issues**
19         **i. Stipulations and Authenticity**
20 The parties have agreed to stipulate to the authenticity of all of the proposed
21 exhibits.
22         **ii. Defendant's Statements**
23 Many of the government's exhibits comprise the defendant's own statements made
24 either to the media, in MCSO press releases, in interviews with investigators, or under oath
25 during depositions and hearings in *Melendres*. A statement offered against an opposing
26 party is not hearsay when the statement was made by the opposing party in an individual
27 or representative capacity. Fed. R. Evid. 801(d)(2)(A). *See United States v. Warren*, 25
28

F.3d 890, 895 (9th Cir. 1994) ("A defendant's 'own out-of-court admissions . . . surmount all objections based on the hearsay rule . . . and [are] admissible for whatever inference the trial judge [can] reasonably draw.'" (quoting *United States v. Matlock*, 415 U.S. 164, 172 (1974) (alterations in original))).

### iii. Prior Testimony of John MacIntyre

The government plans to introduce the prior sworn testimony of MCSO Chief John MacIntyre because he is unavailable. Chief MacIntyre testified and was subject to cross-examination during the 2015 civil contempt evidentiary hearings in *Melendres*. The content of his prior testimony is relevant and material to the government's case. Defense counsel has indicated that the defendant may also seek to admit prior statements made by Chief MacIntyre, and the parties may stipulate to the admissibility of offered statements.

Since Chief MacIntyre is currently in hospice care and is unable, due to his physical illness, to attend trial or testify, he is "unavailable" pursuant to Federal Rule of Evidence 804(a)(4).[1] An unavailable witness's former testimony is not hearsay when it was "given as a witness at a trial, hearing, or lawful deposition," and is later offered against a party who had "an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1). Rule 804(b)(1) requires "similar, but not identical, motivation," and courts must "compar[e] motives at a high level of generality." *United States v. Duenas*, 691 F.3d 1070, 1088 (9th Cir. 2012) (quotation marks omitted). The Ninth Circuit has characterized its approach as an "inherently factual inquiry" based on the "similarity of the underlying issues" and the "context of the questioning," *id.* at 1089 (quoting *United States v. Salerno*, 505 U.S. 317, 326 (1992) (Blackmun, J., concurring)), and courts have routinely admitted such evidence against criminal defendants under the

---

[1] On March 1, 2017, the Court denied the government's Motion for Leave to Depose Witness pursuant to Federal Rule of Criminal Procedure 15. ECF No. 84-1 (Sealed Order). The government first learned of Chief MacIntyre's further deteriorated condition from defense counsel on June 13, 2017. Given Chief MacIntyre's critical condition, the government is not moving for reconsideration of the Rule 15 request.

Rule, *see, e.g., United States v. Geiger*, 263 F.3d 1034, 1038–39 (9th Cir. 2001) (admitting unavailable officer's prior testimony from state court proceeding at federal suppression hearing); *United States v. Poland*, 659 F.2d 884, 896 (9th Cir. 1981) (admitting unavailable eye witness's prior testimony from a suppression hearing at trial because at both proceedings the "central question" was whether the witness's identification was reliable). Two circuits have explicitly held that the Rule applies to prior testimony from a civil proceeding offered at a subsequent criminal trial so long as the similar motive requirement is satisfied. *See United States v. Vartanian*, 245 F.3d 609, 614–15 (6th Cir. 2001) (admitting testimony from civil trial at defendant's criminal trial); *United States v. Paling*, 580 Fed. Appx. 144, 150 (3d Cir. 2014) (admitting civil deposition testimony in subsequent criminal trial and finding "little difference" in the defendant's motives between the two proceedings).

The Rule's requirements of "opportunity and similar motive" are easily satisfied here. The government seeks to admit Chief MacIntyre's prior testimony regarding a single meeting in January 2012 at which he informed the defendant of the preliminary injunction and explained its effect on MCSO's immigration enforcement practices. The defendant's knowledge and understanding of the preliminary injunction were necessary elements of proof for the 2015 *Melendres* civil contempt proceedings in which MacIntryre testified, and as such the defendant's counsel had both the opportunity and nearly identical motive to cross-examine MacIntyre.

### iv. Other Witnesses' Prior Inconsistent Statements

Most of the government's witness have been deposed and testified under oath during the *Melendres* litigation. If any witness testifies inconsistently with his or her prior statements made under oath, the government may seek to admit such statements not only as impeachment, but as substantive evidence. Such use is permitted by Federal Rule of Evidence 801(d)(1)(A): "[a] prior inconsistent statement is not hearsay and may be admitted as substantive evidence if the declarant testifies at trial subject to cross

1 examination and the statement was given under oath at a trial, hearing, or other proceeding,
2 or in a deposition." *United States v. Armijo*, 5 F.3d 1229, 1232 (9th Cir. 1993); *see also*
3 *United States v. Morgan*, 555 F.3d 238, 241 (9th Cir. 1977) (finding the Rule triggered
4 when witness was, at trial, "indefinite and uncertain" about a certain person's identity, but
5 "clearly stated [in his grand jury testimony] that appellant was the person"). Specifically
6 with respect to deposition testimony, the Ninth Circuit has applied this rule in affirming
7 the admission of inconsistent deposition testimony as substantive evidence at a criminal
8 trial. *See United States v. Morgan*, 555 F.2d 238, 242 (9th Cir. 1977); *accord United States*
9 *v. Mornan*, 413 F.3d 372, 378 (3d Cir. 2005) (same).

10 Several government witnesses have also made unsworn recorded statements. The
11 transcription or recordings of these statements have been disclosed to defense counsel and
12 are included in the government's exhibit list. At trial, the government may, pursuant to
13 Federal Rule of Evidence 613, introduce these exhibits as extrinsic evidence of testifying
14 witnesses' prior inconsistent statements where such evidence concerns relevant issues in
15 the case. *See United States v. Higa*, 55 F.3d 448, 452–53 (9th Cir. 1995).

### v. Emails

17 The government plans to introduce emails between MCSO staff members and the
18 County's attorneys concerning the preliminary injunction. The statements in the emails
19 will be admissible either for the non-hearsay purpose of impeaching a witness's testimony,
20 *see Benson v. United States*, 402 F.2d 576, 581 (9th Cir. 1968) ("It is well settled that a
21 prior inconsistent statement of a witness can be used to impeach him."), as statements of
22 an opposing party, *see* Fed. R. Evid. 801(d)(2)(A), as recorded recollections, *see* Fed. R.
23 Evid. 803(5), as statements made by an opposing party's agent or employee, *see* Fed. R.
24 Evid. 801(d)(2)(E), and/or pursuant to Federal Rule of Evidence 803(3), as statements of
25 the declarant's motive, intent, or plan.

### vi. Summary Exhibits

27 Federal Rule of Evidence 1006 provides that a "proponent may use a summary,

- 15 -

chart, or calculation to prove the content of voluminous writings . . . that cannot conveniently be examined by the court." Fed. R. Evid. 1006. "The proponent of a summary of 'voluminous writings' . . . must . . . establish that the underlying materials upon which the summary is based are admissible in evidence," *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988), and such underlying materials must be provided in a reasonable manner to the opposing party, Fed. R. Evid. 1006.

At trial, the government plans to admit three spreadsheets that summarize data arising from HSU traffic stops, arrests, and transfers to federal immigration agencies during 2011, 2012, and 2013. The source materials include voluminous written shift summaries and incident reports, all of which have been provided to defense counsel. The incident reports and shift summaries themselves would be admissible as non-hearsay evidence pursuant to Federal Rule of Evidence 803(6). *See United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983) ("[E]ntries in a police report which result from the officer's own observations and knowledge may be admitted" under the business records exception.).

Respectfully Submitted,

ANNALOU TIROL
Acting Chief, Public Integrity Section

By: */s/ John D. Keller*
John D. Keller
Deputy Chief
Victor R. Salgado
Simon J. Cataldo
Trial Attorneys
United States Department of Justice
Public Integrity Section
1400 New York Ave. NW
Washington, DC  20005
(202) 514-1412
John.Keller2@usdoj.gov
Victor.Salgado@usdoj.gov
Simon.Cataldo@usdoj.go

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing via the CM/ECF system on today's date which will provide notice to counsel of record for the defendant.

*/s/ John D. Keller*
John D. Keller
Deputy Chief