1  Jean-Jacques Cabou (Bar No. 022835)
   Shane R. Swindle (Bar No. 011738)
2  Katherine E. May (Bar No. 032335)
   **PERKINS COIE LLP**
3  2901 North Central Avenue, Suite 2000
   Phoenix, Arizona 85012-2788
4  Telephone: 602.351.8000
   Email: JCabou@perkinscoie.com
5         SSwindle@perkinscoie.com
          KMay@perkinscoie.com
6         DocketPHX@perkinscoie.com

7  Ian Bassin*
   Justin Florence*
8  **THE PROTECT DEMOCRACY PROJECT, INC.**
   2020 Pennsylvania Avenue NW, #163
9  Washington, DC 20006
   Telephone: 202.831.2837
10 Email: Ian.Bassin@protectdemocracy.org
          Justin.Florence@protectdemocracy.org
11
   Noah Messing*
12 **MESSING & SPECTOR LLP**
   333 E. 43rd Street, Suite 1
13 New York, New York 10017
   Telephone: 212.960.3720
14 Email: nm@messingspector.com

15 Phil Spector*
   **MESSING & SPECTOR LLP**
16 1200 Steuart Street, #2112
   Baltimore, Maryland 21230
17 Telephone: 202.277.8173
   Email: ps@messingspector.com
18
   *Attorneys for The Protect Democracy Project, Inc.*
19

20                    UNITED STATES DISTRICT COURT

21                         DISTRICT OF ARIZONA

22 | United States of America, | No. CR-16-01012-001-PHX-SRB |

23              Plaintiff,

24       v.                              **PROPOSED BRIEF OF *AMICUS CURIAE* THE PROTECT**
25 Joseph M. Arpaio,                     **DEMOCRACY PROJECT, INC.**

26              Defendant.

27

28

## **IDENTITY AND INTEREST OF *AMICUS CURIAE***

The Protect Democracy Project, Inc. ("Protect Democracy")[1] is a nonpartisan, nonprofit organization formed to prevent the decline of American democracy. Protect Democracy opposes Executive Branch overreach, such as President Trump's August 25, 2017 Full and Unconditional Pardon of Mr. Arpaio (the "Arpaio Pardon").

On August 31, Protect Democracy co-authored a letter to the Department of Justice ("DOJ") asking the Department to oppose Defendant's Motion for Vacatur and Dismissal with Prejudice (Doc. 220) ("Vacatur Motion") on the basis that the Arpaio Pardon is unconstitutional.[2] Expanding on the arguments outlined in that letter, this brief explains why the Arpaio Pardon was unconstitutional and why the relief sought based upon it should be denied. In the event the DOJ does not vigorously pursue these arguments, *amicus* anticipates asking the Court to "appoint another attorney to prosecute the contempt." Fed. R. Crim. P. 42*; see Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987).

## **SUMMARY OF ARGUMENT**

Defendant's Vacatur Motion asks this Court to take action based on the Arpaio Pardon. Before it may act based on the Arpaio Pardon, the Court must necessarily determine whether that pardon is valid and binding. For the reasons set forth below, the Arpaio Pardon is unconstitutional. It violates the due process of law at the heart of the Constitution as well as core separation of powers features of the Constitution. As such, *amicus* respectfully requests that the Court declare the Arpaio Pardon null and void and without effect, and accordingly deny Defendant's Vacatur Motion.

As described more fully below, the Arpaio Pardon runs afoul of three different constitutional commands. Any one of these would suffice to render it unconstitutional;

---

[1] Terms defined in Protect Democracy's Motion for Leave have their same meaning in this Brief.

[2] Letter from Free Speech for People and Protect Democracy to Raymond N. Hulser and John Dixon Keller (Aug. 29, 2017), https://protectdemocracy.org/wp-content/uploads/2017/08/Ltr-to-DOJ-082917-integrity-section.pdf.

that the Arpaio Pardon fits within the confluence of all three renders it a severe threat to our constitutional order. Affirming the constitutionality of the Arpaio Pardon, and granting Defendant's Vacatur Motion, would mark a dangerous and unconstitutional expansion of the Executive Branch's power.

*First*, the Arpaio Pardon violates the Due Process Clause of the Fifth Amendment. While the President's pardon power is broad, it is not unbounded. Like other prerogatives assigned to the Executive Branch, the pardon power cannot be read to negate other provisions of the Constitution. The President could not, for instance, declare pardons for all white people and only white people who had been or might be convicted of federal gun offenses. That would fail to read the pardon power in harmony with the Equal Protection Clause.

Similarly, here, the pardon power in Article II must be read in harmony with the later-enacted Due Process Clause. When the law of the land grants a court jurisdiction and the authority to resolve private litigants' claims, the Due Process Clause protects those litigants' ability to obtain appropriate relief in that court. Due process is violated if the President can eviscerate a court's ability to ensure compliance with the law by those who wrong the rights of private parties. And as the Supreme Court has explained, "the Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (internal citations and alterations omitted). When private litigants went to court in this district to protect their constitutional rights against Mr. Arpaio, the court issued orders to provide them relief under the law. When those orders were ignored, the courts entered an escalating series of contempts to enforce compliance with the law and ensure the protection of private parties' constitutional rights. The Arpaio Pardon violates the Due Process Clause by limiting the protection of private rights, rendering the due process guaranteed by law an empty promise.

*Second*, the Arpaio Pardon exceeds the President's own constitutional authority under the pardon power. We are aware of no case in this Court, the Ninth Circuit or the

Supreme Court that has upheld a pardon matching the extraordinary circumstances here, where the contempt is used to enforce court orders protecting the rights of private litigants. The Supreme Court's decision in *Ex Parte Grossman*, 267 U.S 87 (1925), involved a contempt order to enforce a regulatory statute (the National Prohibition Act)—not private constitutional rights. In upholding that pardon, the Court in *Grossman* read the pardon power to distinguish between pardons of contempt orders that advance the interests of the government (as in that case, which are permissible) and pardons of contempt orders that involve the rights of private litigants (which exceed the president's authority). This distinction accords with the constitutional text, which allows only pardons of offenses "against the United States," not of contempt orders that arise to enforce the rights of private litigants. In this way, the Pardon Clause in Article II itself accords with the protection of private rights in the Due Process Clause.

*Third*, the Arpaio Pardon violates the separation of powers because it unconstitutionally interferes with the inherent powers of the Judicial Branch. The Supreme Court has held that the ability to issue criminal contempt orders is essential to the Article III judicial power and the administration of justice. *See Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987). To the extent any doubt remains about the application of *Grossman* to pardons for criminal contempt when the rights of private parties are at stake, *Young* indicates that the Court in more recent years has recognized the need to protect the judicial power. The Arpaio Pardon, which would blunt a court's valid and binding exercise of judicial power to safeguard the rights of private parties, impermissibly transgresses Article III.

In short, the separation of powers design of the Constitution in Articles II and III and the protection of the rights of the people in the Fifth Amendment point to the same conclusion. The President may not pardon a criminal contempt finding when: (i) the contempt arises out of a matter involving the rights of private litigants and (ii) the contempt is a valid and binding exercise of judicial power designed to ensure proper redress for those private litigants' rights. That principle reaches its zenith when the

1  private litigants' rights are *constitutional* rights. The Arpaio Pardon fits squarely within
2  these criteria and so is invalid.

3  The President may no more use the pardon power to trample the rest of the
4  Constitution and the Bill of Rights, than he may use the Commander-in-Chief power to
5  call down airstrikes on political opponents. The pardon power does not trump the rest of
6  the Constitution. The Arpaio Pardon seeks to do just that. This Court should declare the
7  Arpaio Pardon unconstitutional, decline to give that pardon its imprimatur, and deny
8  Defendant's Vacatur Motion.

## ARGUMENT

### I. DEFENDANT'S VACATUR MOTION NECESSARILY REQUIRES THE COURT TO FIRST RESOLVE THE CONSTITUTIONALITY OF THE ARPAIO PARDON.

The Vacatur Motion asks this Court to take a series of actions based on the Arpaio Pardon. Because the pardon is the sole basis for the relief Defendant seeks, the Court cannot avoid considering the validity of that pardon. No matter how much Defendant and the President might wish it were otherwise, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

While it is no doubt true that Congress may choose to respond to an abuse of the pardon power with impeachment, that does not mean it is beyond the power of the courts to say when a particular pardon is unconstitutional. Impeachment is the exclusive remedy only when the pardon or pardons at issue are constitutionally permissible. *See Grossman*, 267 U.S. at 121-22. But when a pardon is unconstitutional—e.g., if there were a pardon of a state offense, or a pardon in a case of impeachment, or a pardon for all and only white people—the judiciary may not give it effect.

### II. THE ARPAIO PARDON VIOLATES THE DUE PROCESS CLAUSE.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. The Due Process Clause protects the right of private litigants to bring their claims before an

1  impartial and empowered court and prohibits extreme and arbitrary actions of government
2  officials, including the Executive Branch.  And the Due Process Clause in the Fourteenth
3  Amendment protects certain constitutional rights from interference by state officials.  The
4  pardon power cannot breach the fundamental constitutional protection of due process.
5  The Arpaio Pardon would do that and so is invalid.

6  "The words, 'due process of law,' were undoubtedly intended to convey the same
7  meaning as the words, 'by the law of the land,' in *Magna Charta*."  *Den ex dem. Murray*
8  *v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 276 (1855).  And the law of the land
9  includes the ability of private citizens to appeal to courts for redress of legal violations.
10 As William Blackstone explained, "[s]ince the law is . . . the supreme arbiter of every
11 man's life, liberty, and property, courts of justice must at all times be open to the subject,
12 and the law be duly administered therein" to satisfy the subordinate right of "applying to
13 the courts of justice for redress of injuries."  1 William Blackstone, Commentaries *141.
14 In the words of one scholar, since the writings of Edward Coke in the early 1600s, "the
15 rights to due process, to open courts, to have one's rights determined by the law of the
16 land, and to obtain remedies for wrongs were regarded as close cousins, if not
17 substantially overlapping."  John C.P. Goldberg, *The Constitutional Status of Tort Law:*
18 *Due Process and the Right to A Law for the Redress of Wrongs*, 115 Yale L.J. 524, 627
19 n.182 (2005).

20 "At its core, the right to due process reflects a fundamental value in our American
21 constitutional system."  *Boddie v. Connecticut*, 401 U.S. 371, 374 (1971).  "It is to courts,
22 or other quasi-judicial official bodies, that we ultimately look for the implementation of a
23 regularized, orderly process of dispute settlement.  Within this framework, those who
24 wrote our original Constitution, in the Fifth Amendment, and later those who drafted the
25 Fourteenth Amendment recognized the centrality of the concept of due process in the
26 operation of this system."  *Id.* at 375.

27 While the Due Process Clause does not guarantee access to federal courts for all
28 legal disputes, when the Constitution and other laws afford access to the courts, due

1  process requires that the tribunal be impartial and empowered to fully resolve the dispute.
2  *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (internal citation and
3  quotation omitted) ("It is axiomatic that [a] fair trial in a fair tribunal is a basic
4  requirement of due process."). If courts cannot resolve disputes before them using the full
5  judicial power, the due process rights of litigants are violated—whether that limitation
6  arises from the court itself or interference from another official. And among the tools of
7  the judiciary that are "essential to the administration of justice" is the criminal contempt
8  power. *Young*, 481 U.S. at 795 (quoting *Michaelson v. U.S. ex rel. Chicago*, 266 U.S. 42,
9  65-66 (1924)). If courts are unable to rely on that essential tool in matters such as this,
10 they cannot provide due process to private litigants in cases before them.

11       This concern is heightened here where the deprivation of due process occurs twice.
12 The contempt findings here occurred only after private plaintiffs showed that their
13 constitutional rights under the Fourteenth Amendment's Due Process Clause (which
14 incorporates the Fourth Amendment against states) were being violated by Mr. Arpaio and
15 others. *See* First Am. Compl. ¶ 127, *Melendres v. Arpaio*, No. 2:07-CV-02513-GMS
16 (Sept. 5, 2008) (Doc. 26); *id.* ¶ 133 ("These actions violated Plaintiffs' and class members'
17 Fourteenth Amendment rights and 42 U.S.C. § 1983."). In an effort to protect the due
18 process rights of the litigants before it, the judiciary turned to an escalating series of
19 orders, including contempts. The Arpaio Pardon seeks to prevent this Court from taking
20 the steps necessary to vindicate the constitutional rights of private litigants.

21       The later-in-time constitutional amendments, including the Due Process Clauses in
22 the Fifth and Fourteenth Amendments, modify the original Articles of the Constitution by
23 limiting the power of government and protecting the rights of the people. As James
24 Madison remarked in introducing the Bill of Rights in Congress, "the great object in view
25 is to limit and qualify the powers of government, by excepting out of the grant of power
26 those cases in which the government ought not to act, or to act only in a particular mode."
27 James Madison, Address to Congress Introducing the Bill of Rights (June 8, 1789),
28 http://www.revolutionary-war-and-beyond.com/james-madison-speech-june-8-1789.html

(last visited Sept. 10, 2017). Madison explained that the proposed amendments to protect particular rights were directed, "sometimes against the abuse of the executive power, sometimes against the legislative, and, in some cases, against the community itself; or, in other words, against the majority in favor of the minority." *Id.* In keeping with this principle, the President's pardon power cannot be used in contradiction of the Bill of Rights, any more than the Commander-in-Chief power can be used to seize private homes. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 644 (1952) (Jackson, J., concurring) ("That military powers of the Commander-in-Chief were not to supersede representative government of internal affairs seems obvious from the Constitution and from elementary American history. Time out of mind, and even now in many parts of the world, a military commander can seize private housing to shelter his troops. Not so, however, in the United States, for the Third Amendment . . . .").

Moreover, it was only the later-added Bill of Rights that created judicially-enforceable constitutional rights of private individuals. So at the time the Framers drafted the Pardon Clause itself, there was no reason to account for this scenario.[3] As the following sections describe, a pardon of contempts in situations such as this one is beyond the reach of the President's Article II pardon power and impermissibly intrudes upon the judicial power established by Article III. But even if the Court were to adopt an interpretation of the pardon power and Article III to allow presidents to grant clemency even for contempts enforcing court orders protecting private parties, the Due Process Clause requires circumscribing that power in situations such as this involving the constitutional due process rights of private parties.[4]

---

[3] This also explains why impeachment cannot be the exclusive remedy for pardons of this type. Impeachment is a political tool available to majorities (and super majorities at that). To rely on a majoritarian tool as the exclusive means of protecting individual and minority rights when they are violated and that violation is excused by a pardon would render those rights vulnerable to majorities and so makes no structural sense.

[4] The *Grossman* case—which, as described below, did not involve a contempt arising to protect the rights of private litigants, let alone their *constitutional* rights—did not consider the due process limits of the pardon power.

-7-

**III.   THE ARPAIO PARDON EXCEEDS THE PRESIDENT'S AUTHORITY UNDER THE PARDON CLAUSE.**

The U.S. Constitution vests the president with the "power to grant reprieves and pardons for offences against the United States, except in cases of impeachment." U.S. Const. art. II, § 2, cl. 1.  This power is finite, limited by the text and structure of the Constitution.  The constitutional text, as well as Supreme Court precedent, contemplate a specific limit on the pardon power that avoids the due process violation described above.  In particular, the pardon power simply does not extend to contempt orders issued by courts to enforce orders protecting private litigants.

It is well-settled that the pardon power is not unlimited.  The text of the clause itself, for example, indicates that pardons cannot be used in "cases of impeachments." *Id*.  The constitutional text also limits pardons to offenses "against the United States." *Id*.  Not all offenses are against the United States.  Thus, presidents may only pardon federal offenses, not state offenses.  *United States v. Crowell*, 374 F.3d 790, 794 (9th Cir. 2004).  In the context of contempt orders, the textual limit on the pardon power to offenses "against the United States" accords with the due process principles described in the preceding section.  The President may not issue a pardon to halt a court's use of a contempt order to enforce its orders protecting the rights of private litigants.

The Supreme Court's decision in *Grossman* did not involve a contempt to enforce a court order protecting private litigants.  Thus, *Grossman* did not confront the due process limits on the pardon power described above.  But the Court's analysis in *Grossman* nonetheless recognizes a critical distinction between contempts that protect a governmental or public interest, and those that protect private litigants.

In *Grossman*, the Court upheld a pardon of a defendant who had been found guilty of contempt for violating an injunction not to sell alcohol under the National Prohibition Act. After spending a couple of years in prison, Grossman received a pardon—an act that, when the pardon was issued in 1923, was vastly more common than it is today.  W.H. Humbert, *The Pardoning Power of the President* 112, tbl. IV (1941); *see also* U.S. DOJ,

1  Office of Pardon Attorney, Clemency Statistics, https://www.justice.gov/
2  pardon/clemency-statistics (last visited Sept. 10, 2017).[5]

3  The Court in *Grossman* did not hold that all contempts could be pardoned. After
4  an exhaustive review of English and U.S. pardons of contempt orders, the Court
5  distinguished between two categories of contempt orders.  It described first the type of
6  judicial contempt decrees that the president may pardon: "a sentence for contempt in so
7  far as it had been imposed to punish the contemnor for violating the dignity of *the court*
8  *and the king, in the public interest* . . . ." 267 U.S. at 111 (emphasis added).  This was the
9  category at issue in *Grossman*, where the Court had issued the contempt order to enforce a
10 public statute, the National Prohibition Act.

11 By contrast, the Court explained, the president's clemency powers do not reach a
12 contempt order that "is remedial and for the benefit *of the complainant*." *Id.* (emphasis
13 added).  The Court explained that a president may not grant clemency for such contempt
14 orders because they are a "remedial part of the court's order necessary to secure the rights
15 *of the injured suitor*." *Id.* (emphasis added).  In case there was doubt, the Court returned
16 to this point again for emphasis again at the end of the opinion:  "Neither in this country
17 nor in England can [a pardon] interfere with the use of coercive measures to enforce *a*
18 *suitor's right*." *Id.* at 112 (emphasis added).

19 In other contexts, too, the Court has held that the pardon power cannot interfere
20 with the rights of private parties. *See, e.g.*, *Knote v. United States*, 95 U.S. 149, 154 (1877)
21 ("And if the proceeds of the sale have been paid to a party to whom the law has assigned
22 them, they cannot be subsequently reached and recovered by the offender.").  And
23 although the Court in *Grossman* discussed what was "nowadays referred to as the

---

[5] The Court rejected the argument that a contempt order was not an "offense" such that no contempts could ever be pardoned.  In particular the Court pointed to "the possibility that the personal element may sometimes enter into a summary judgment pronounced by a judge who thinks his authority is flouted or denied?"  *Grossman*, 267 U.S. at 122.  Notably, modern criminal contempt procedures employed here, where the judge whose order is defied refers the contempt proceeding to a different judge, rather than unilaterally trying the contemnor himself, significantly reduce this concern.  *See* Order Re Criminal Contempt (Aug. 19, 2016) (Doc. 1).

difference between civil and criminal contempts," 267 U.S. at 111, courts have recognized that the line between the two is thin—civil contempt orders sometimes advance a court's interest and criminal contempt orders sometimes prove necessary to protect private parties.[6] What matters is the character and purpose of the contempt at issue, not the formalistic category. This distinction between contempts protecting only public or governmental interests (offenses against "the United States") and those protecting private suitors places an important constraint on the President. It prevents abuses that would arise if, for instance, the president pardoned a favored company that refused to comply with an injunction to stop infringing a disfavored company's intellectual property rights. *Cf. Young*, 481 U.S. at 787 (upholding a contempt order to protect the trademark rights of a litigant).

To date, no federal court has addressed what would happen in a matter such as this where a president sought to pardon a criminal contempt in a case arising from a court's enforcement of orders protecting private rights. But other sources underscore, time and again, that a pardon cannot affect a contempt issued to aid enforcement of private rights. *See, e.g.*, *State v. Verage*, 187 N.W. 830, 834 (Wis. 1922) ("[T]he king's power to pardon did not extend to those cases where punishment in the nature of contempt was inflicted for the purpose of securing to a suitor private rights which it was the duty of the court to enforce. This is well recognized and there is no authority to the contrary."); Charles D. Berger, *The Effect of Presidential Pardons on Disclosure of Information: Is Our Cynicism Justified?*, 52 Okla. L. Rev. 163, 179 (1999) ("[T]he *Grossman* Court's statement that a pardon cannot 'interfere with the use of coercive measures to enforce a suitor's right' seems correct. The same conclusion has been reached by all state courts that have considered the matter, and is universally accepted in the academic literature."); Noah A.

---

[6] As the Supreme Court has observed, "[a]lthough the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see id.* at 836 ("Respondents' argument highlights the difficulties encountered in parsing coercive civil and criminal contempt fines. The fines imposed here concededly are difficult to distinguish . . . .").

Messing, *A New Power?: Civil Offenses and Presidential Clemency*, 64 Buff. L. Rev. 661, 669 (2016) ("[T]he president may not pardon someone held in *contempt* in a case between private parties--even if the individual is jailed for his or her contempt.").

The criminal contempt order against Defendant is aimed at vindicating the power of the courts to protect private litigants—not just a public interest of the United States like the National Prohibition Act in *Grossman*. These contempt proceedings arise out of litigation over private rights, and the contempt is designed to ensure the ability to protect those private rights. Private parties filed a suit against Mr. Arpaio because their constitutional rights were being violated. After four years of litigation, the court enjoined defendants, including Mr. Arpaio, from continuing to violate these private rights. The courts instituted criminal contempt proceedings because prior civil contempt orders were ineffective in protecting the constitutional rights of private individuals living in Maricopa County or passing through it. Put simply, the criminal contempt proceedings arose from litigation to protect Latinos and Latinas whose rights Arpaio had violated and continued to violate, and sought to enforce compliance with orders aimed at protecting those private rights.

This is not a situation where the court initiated criminal contempt proceedings against Mr. Arpaio purely to protect some abstract governmental interest of the United States. In this case, the limits in the Pardon Clause align with and reinforce the protection of private rights by the Due Process Clause described above—all the more so in a case like this involving private constitutional rights. For this reason too, the President lacks authority for the Arpaio Pardon.

**IV. THE ARPAIO PARDON VIOLATES THE SEPARATION OF POWERS BY IMPERMISSIBLY INTERFERING WITH THE JUDICIAL POWER.**

The Arpaio Pardon also violates a core power of the courts. "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right." *Marbury*, 5 U.S. at 163. In keeping with that bedrock

principle of American law, the Supreme Court has described it as "established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state officers from doing what the 14th Amendment forbids the state to do." *Bell v. Hood*, 327 U.S. 678, 684 (1946) (footnotes omitted).  And, where, as in *Melendres v. Arpaio* (No. 2:07-CV-02513-GMS), "federally protected rights have been invaded, it has been the rule from the beginning that . . . federal courts may use any available remedy to make good the wrong done." *Bell*, 327 U.S. at 684 (footnotes omitted).

One such "available remedy" by which courts vindicate private legal rights is the power of criminal contempt.  In *Young*, the Supreme Court underscored that "the power to punish for contempts is inherent in all courts, has been many times decided and may be regarded as settled law."  481 U.S. at 795 (quoting *Michaelson*, 266 U.S. at 65-66). Indeed, the Court described this power as "essential to the administration of justice." *Id.*

The Supreme Court emphasized in *Young* that the criminal contempt tool is so central to the judiciary that it may not be left to the mercy of the Executive Branch.  *Id.* at 801 ("If the Judiciary were completely dependent on the Executive Branch to redress direct affronts to its authority, it would be powerless to protect itself if that Branch declined prosecution.").  Even though the power to prosecute is assigned by the Constitution to the Executive Branch, the judiciary can appoint private attorneys where needed to prosecute contempt violations.  *Id*. at 801.  As the Court explained, "[t]he ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches."  *Id.* at 796.  The Court repeated in *Young* its long-standing view that "[i]f a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the judicial power of the United States would be a mere mockery."  *Id.* (quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450, (1911)).

The Arpaio Pardon creates just such a mockery of the courts. If the Executive Branch cannot render the Judicial Branch powerless to protect the rights of litigants through declining to prosecute a contempt on the front-end, neither can it do so through pardoning or promising to pardon a criminal contempt once that conviction has been handed down.

"[O]ur Constitution unambiguously enunciates a fundamental principle—that the 'judicial Power of the United States' must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 60 (1982). Preserving the integrity and independence of one branch of government from intrusion by another is both required and salutary. For "[l]iberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring). The Arpaio Pardon violates the essential power of the Judicial Branch and so is unconstitutional.

*   *   *   *   *

Lastly, the Arpaio Pardon threatens our constitutional system for yet an additional reason: it breaches the President's oath to protect and defend the Constitution, *see* Article II, Section 1, Clause 2, and his duty to faithfully execute the laws, *see* Article II, Section 3. The Arpaio Pardon does not faithfully execute the law; it sends a signal that public officials, so long as they are allies of the President, need not execute the law at all. The President cannot use the pardon power to invite other public officials to violate people's constitutional rights.

Here, Defendant violated federal law, and then violated an injunction designed to prevent further violations of that law, and then violated civil contempt orders designed to prevent violations of the injunction. Rather than upholding his constitutional responsibilities to defend the Constitution and faithfully execute the law, the President explicitly substituted his opinion for that of the Court, declaring, in derogation of the

evidence and findings made by the Court, that Defendant "was 'convicted for doing his job.'" Associated Press, *Trump hints that Arpaio pardon will happen*, Fox News Politics (Aug. 22, 2017), http://www.foxnews.com/politics /2017/08/22/trump-hints-that-arpaio-pardon-will-happen.html. The President did not issue the Arpaio Pardon as an act of mercy for one who had accepted responsibility and shown remorse, *see* U.S. DOJ, Office of Pardon Attorney, Standards for Consideration of Pardon Petitions § 1-2.112, https://www.justice.gov/pardon/about-office-0 (last visited Sept. 10, 2017), or to "restore the tranquillity [sic] of the commonwealth," *see* The Federalist No. 74 (Alexander Hamilton). He did so to reward Defendant for violating the Constitution.

Our constitutional system is placed in jeopardy when government officials no longer are constrained by the rule of law. When a court, following the proper judicial process, concludes that a government official has violated the law, the Constitution directs the President to take care to faithfully execute that decree. Here, the President has sought to take the judicial power into his own hands. "The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47 (James Madison). If a President is permitted to decide for himself that his political supporters and allies need not enforce the law, and that courts may not use their full constitutional powers to protect private constitutional rights, the Constitution can no longer protect the rights of all.

In a different context, the Supreme Court recently observed: "It is true that extreme cases often test the bounds of established legal principles, and sometimes no administrable standard may be available to address the perceived wrong. But it is also true that extreme cases are more likely to cross constitutional limits, requiring this Court's intervention and formulation of objective standards. This is particularly true when due process is violated." *Caperton*, 556 U.S. at 887. The Arpaio Pardon is that extreme case.

## V.  CONCLUSION

For the foregoing reasons, *amicus* respectfully requests that the Court declare the Arpaio Pardon unconstitutional, decline to give it effect, and accordingly deny the Vacatur Motion.

Dated:  September 11, 2017     **PERKINS COIE LLP**

By: *s/Jean-Jacques Cabou*
Jean-Jacques Cabou
Shane R. Swindle
Katherine E. May
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Ian Bassin*
Justin Florence*
**THE PROTECT DEMOCRACY PROJECT, INC.**
2020 Pennsylvania Avenue NW #163
Washington, DC 20006

Noah Messing*
**MESSING & SPECTOR LLP**
333 E. 43rd Street, Suite 1
New York, New York 10017

Phil Spector*
**MESSING & SPECTOR LLP**
1200 Steuart Street # 2112
Baltimore, Maryland  21230

*Attorneys for The Protect Democracy Project, Inc.*

*Application for Admission *Pro Hac Vice* Pending

**CERTIFICATE OF SERVICE**

☒   I hereby certify that on September 11, 2017, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants for this matter.

s/ Marie van Olffen

127224-0001/136841361.4