Larry A. Hammond, 004049
Joshua D. Bendor, 031908
OSBORN MALEDON, P.A.
2929 N. Central Ave., Suite 2100
Phoenix, Arizona 85012-2793
(602) 640-9000
lhammond@omlaw.com
jbendor@omlaw.com

Attorneys for Erwin Chemerinsky, Michael E. Tigar, and Jane B. Tigar

OSBORN MALEDON
A PROFESSIONAL ASSOCIATION ATTORNEYS AT LAW

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiffs,<br><br>v.<br><br>Joseph M. Arpaio,<br><br>Defendant. | No. CR-16-01012-001-PHX-SRB<br><br>**[PROPOSED] MEMORANDUM OF *AMICI CURIAE* ERWIN CHEMERINSKY, MICHAEL E. TIGAR, AND JANE B. TIGAR** |

Erwin Chemerinsky, Michael E. Tigar, and Jane B. Tigar, by and through counsel, submit this Memorandum as *Amici Curiae* in opposition to the Defendant's Motion to Vacate. Amici are law teachers, human rights lawyers and legal scholars with broad experience in the fields of judicial review and constitutional law. They submit that their expressed views may assist the Court in its task. In addition, given the shifting positions taken by counsel for the United States, this is one of those cases when an amicus filing may be especially significant. The Court has the inherent power in cases of contempt to appoint a special prosecutor, *Young v. United States ex rel. Vuitton et Fils*, 481 U.S. 787, 795 (1987), so it surely has the power to hear amici.

## I. INTRODUCTION

The President's purported pardon of Mr. Arpaio is void. The President's action is not authorized by the article 2, sec. § 2, limited grant of the pardon power, because Mr. Arpaio's contempt is not an "Offense" within the meaning of that grant.

In addition, the purported pardon violates two basic constitutional principles. First, Article III courts have a duty to provide effective redress when a public official commits harm by violating the Constitution. As discussed below, Chief Justice Marshall described this duty in *Marbury v. Madison*, 5 U.S. 137 (1803), and his words have guided the federal courts ever since.

Second, Article III courts possess inherent power to enforce their orders, and this power exists outside and beyond legislative empowerment and executive whim. This power has as good or better a constitutional pedigree than any presidential claim. The Framers of the Constitution believed that this inherent power was, in Hamilton's words "particularly essential in a limited Constitution."

## II. PROCEDURAL HISTORY

This case began as one of many lawsuits by victims of Mr. Arpaio's unconstitutional conduct. Well after the injunctions were issued, the United States intervened. Mr. Arpaio violated the injunctions.

Relevant history of this case is set out in the contempt finding, July 31, 2017, Docket No. 2:16-cr-01012, Docket #210. Other relevant history was related by lawyers for the United States in a Supreme Court brief in opposition to Mr. Arpaio's Petition for Writ of Mandamus, *In re Arpaio*, No. 16-1422, 2017 WL 2839354, discussed in more detail below.

## III. THE CONSTITUTIONAL BASIS FOR, AND LIMITS UPON, THE PARDON POWER

The pardon power, U.S. const., art. 2, § 2, extends to "Offenses against the United States." That power is broad, see *Schick v. Reed*, 419 U.S. 256 (1974) (6-3), but not limitless. The purported pardon of Mr. Arpaio was beyond the Constitution-granted power.

*Ex parte Grossman*, 267 U.S. 87 (1925) (Taft, C.J.) (unanimous), is a leading case on the pardon power, and was heavily relied on by the majority in *Schick*, 419 U.S.

at 266. The Court held that a pardon issued by the President with respect to Grossman's contempt was valid.

A cursory review might suggest that *Grossman* supports the purported pardon at issue in this case. That would be mistaken, for reasons that appear within the Court's opinion, and are bolstered by the constitutional context within which this case arises.

*Grossman* arose under the National Prohibition Act, 41 Stat. 305 (1919) (Volstead Act or "Act"). Title II of the Act, entitled "Prohibition of Intoxicating Beverages," declared numerous activities with respect to alcohol "unlawful." If any person committed any of these unlawful acts, the government had two options. Under § 22 of the Act, the government could obtain an injunction to abate that "nuisance." The government also had the option to proceed directly with a prosecution for violating the Act. The Act, § 29.

The government chose the "nuisance" option. But despite the issuance of an injunction, Grossman apparently persisted in his unlawful activity. The government prosecuted him under § 24 of the Act, which defined his alleged conduct as a "contempt" and provided the mode of trial. He was convicted and sentenced to six months' imprisonment. The President issued a pardon. The district court held the pardon to have been invalid and ordered Grossman to jail. Grossman sought habeas corpus. The Supreme Court held the pardon to have been valid. It held that the pardon power found in art. 2, § 2 is based on the Crown's power of pardon as it existed in 1787, and that such power is broad enough to cover Grossman's case.

Although § 24 of the Act denominated Grossman's offense as "contempt," several important distinctions appear from reading the case:

- The unlawful conduct was defined by the Congress in a statute, § 22 of the Act. In the present case, the duties imposed on Mr. Arpaio were defined by the court. We show in detail below why this fact is significant.
- The Act created a series of offenses, and gave the government options as to how to proceed against offenders.
- The "contempt" mentioned in § 24 of the Act was not the "contempt" to which the present 18 U.S.C. § 401 refers. Sec. 401 is complete unto itself. The Volstead Act created offenses and provided for modes of enforcement.

- The proceedings against Grossman were conducted by public authority to vindicate a public interest. In the case now before the Court, private persons sought and obtained judicial relief from unlawful governmental action.
- The Court expressly noted that the common law recognized, a purported pardon's "inefficacy to halt or interfere with the remedial part of the court's order necessary to secure the rights of the injured suitor."

The last-noted distinction refers to common law practice that was rooted in the struggle to restrain and control the Crown's claims of unlimited power. The English historian W.S. Holdsworth wrote about these developments:

> This process of interpretation tended, more especially after the Revolution, to limit the independent action of the King.
>
> The King could not, for instance, arrest a man. Powers of arrest were fettered by strict legal conditions. For a wrongful arrest the injured person must have a remedy, which he could not have if the King in person could make the arrest. Similarly, the jurisdiction of courts depended on the rules of the common law. The King could not interfere with the boundaries of these jurisdictions, because he had no power to change the rules of the common law. For the same reason the King could not, by an exercise of his prerogative, prejudice those rights of his subjects which were secured to them by the rules of the common law.
>
> "The King's prerogative," says Finch, "stretcheth not to the doing of any wrong." This was a serious limitation upon his powers. Thus, he could not, by the exercise of his power to pardon, prejudice the right of an injured person to prosecute a criminal appeal. . . .

10 W.S. Holdsworth, A History of English Law 361 (1938).

Holdsworth's statement concerning limits on the pardon power cites Lord Coke's Third Institute, which in turn cites Bracton. Coke wrote the Institutes between 1628 and 1644. The Supreme Court has regarded them as an authoritative statement of the common law. *See, e.g., Roe v. Wade*, 410 U.S. 113, 134 (1973). Henry de Bracton was a 13th Century English legal scholar whose treatise "On the Laws and Customs of England" is likewise considered authoritative.

The term "appeal of felony" refers to the common law procedure whereby a victim of crime could bring a criminal case against the wrongdoer, obtaining compensation and a criminal punishment. Appeals of felony were thus private lawsuits, bearing some resemblance to modern civil rights and other tort litigation. If the Crown prosecuted an offense in its own name, the Crown would reap the financial rewards that

might result from a conviction. If the plaintiff who brought an appeal of felony lost the case, he or she might then be subjected to penalties, and would have to seek a royal pardon. But as Coke and Bracton noted, the Crown had no power to pardon the defendant/wrongdoer. *See generally* Margaret Kerr, The Distinction Between Crime and Tort in the Early Common Law, 76 B.U.L.Rev. 59 (1996) (noting that the appeal of felony was one aspect of the intertwined nature of crime and tort).

It is not surprising that, in the 1600s, the Crown was considered to have no power to deprive a private litigant of rights nor to curtail the judicial power of royal courts to vindicate the rights of a private litigant. After all, in c. 40 of Magna Charta – perhaps the best known of all its provisions – King John had promised: "To no one will we sell, to no one will we deny, or delay right or justice." And Lord Coke had famously said in Parliamentary debate: "Magna Charta is such a fellow that he will have no sovereign." On the English Revolution, its antecedents and consequences, including the motivation of Coke and his allies to limit royal prerogative and elevate judicial power, *see generally* Christopher Hill, Reformation to Industrial Revolution (1967).

The common law limits on the Crown's power are particularly important in considering the Constitution of 1787 and its mandated separation of powers. Madison promised us that we would, under this Constitution, be free from the "impious doctrine of the Old World that people were made for Kings and not Kings for people." Federalist No. 45.

The distinction between offenses prosecuted by the sovereign and punishments imposed by a court to protect private rights is reflected as well in 18 U.S.C. §§ 40l, 402. The Trump administration Justice Department recognized this distinction, and set out its reasoning in the Supreme Court pleading quoted below. The Department filed a Supreme Court brief on behalf of the United States in opposition to Mr. Arpaio's Petition for Writ of Mandamus, *In re Arpaio*, No. 16-1422, 2017 WL 2839354. The Court had referred the matter to the government for prosecution. This was simply a matter of judicial discretion as to the mode of proceedings, as the Court had the inherent

power to select who was to prosecute. *See Young v. United States ex rel. Vuitton et Fils*, 481 U.S. 787, 795 (1987) (inherent power to appoint private prosecutor). As the United States told the Supreme Court, 2017 WL 2839354 at *4:

> The government responded by agreeing to prosecute petitioner for contempt under 18 U.S.C. § 401(3). . . . The government concluded that petitioner's conduct was criminal solely because it was contumacious, and that his acts were not of such character as to constitute another federal or state crime. . . . The government further concluded, however, that Section 401 applied to the other individuals because their allegedly contumacious conduct - concealing documents and hard drives - was of such character as to constitute obstruction of justice under 18 U.S.C. §§ 1503 and 1512. . . . The government therefore concluded that a prosecution of the other individuals would be time-barred. *Ibid.*
>
> On October 25, 2016, the newly assigned district court judge issued an Order to Show Cause under 18 U.S.C. §401(3) as to whether petitioner should be held in criminal contempt for willfully disobeying the Melendres preliminary injunction. See Pet. App. 9a-12a. ., . .

The government's participation was not based on a finding that there had been an "offense" previously defined by Congress. Indeed, the Order to Show Cause was the last step in the process.

Because this Court acted in reliance on the United States' position that this was a contempt to vindicate the rights of litigants, no lawyer for the United States should be heard to take a different position.

## IV. THE CONSTITUTIONAL FOUNDATIONS FOR THE DISTINCTION BETWEEN PUBLIC PROSECUTION FOR "OFFENSES" AND COURT ACTION TO PROTECT LITIGANT RIGHTS AND THE COURT'S OWN PROCESSES

Two separate lines of constitutional authority support the reasoning set out above. The first is the judicial duty to redress governmental violations of rights. The second is the inherent character of the judicial contempt power, a power with as good or better a common law pedigree than any presidential claim.

## V. THE FIRST PRINCIPLE: RIGHT TO REDRESS

The victims of Mr. Arpaio's conduct had a right – based on Article III of the Constitution – to have their claims heard and decided, that is, to have a remedy. Chief Justice Marshall wrote in *Marbury v. Madison*, 5 U.S. at 17:

> The very essence of civil liberty consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection…. The government of the United States has been emphatically termed a government of law and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested right…. If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar nature of this case.

Marshall wrote those words in 1803. Once the 14th amendment was ratified, the scope of judicial duty and authority was expanded to include protection from state as well as federal official misconduct.

Marshall's views echoed those of his contemporaries. In a famous dissent by Judge Cranch, whose view prevailed in the Supreme Court, we find:

> It then becomes the duty of the judiciary calmly to poise the scales of justice, unmoved by the arm of power, undisturbed by the clamor of the multitude.

*United States v. Bollman*, 24 F.Cas. 1189 (C.C.D.C. 1807) (No. 14622) (Cranch, J., dissenting), *rev'd*, 8 U.S. 75 (1807), discussed in Bloch & Ginsburg, Celebrating the 200th Anniversary of the Federal Courts of the District of Columbia, 90 Geo.L.J. 549 (2002).

Another important separation of powers ruling was *Gilchrist v. Collector of Charleston*, 10 Fed. Cas. 355 (C.C.D.S.C. 1808) (No. 5420). In 1807, Congress – seeking to retaliate against British and French interests – authorized an embargo on foreign seaborne commerce. In 1808, amending legislation authorized the customs collector at any port to detain any vessel suspected of engaging in foreign commerce. The customs collector at Charleston, South Carolina – a federal official – denied a ship belonging to Adam Gilchrist clearance to leave the port, suspecting that Gilchrist was not engaged in coastwise domestic shipping but rather foreign travel. Justice William Johnson, sitting as circuit judge, heard evidence and ordered the collector to let Gilchrist's ship leave the port. Johnson held that despite the broad statutory language, federal courts had the power to control actions of the executive branch. Jefferson, who had appointed Johnson to the Supreme Court, was enraged at the decision. He directed

Attorney General Caesar Rodney to write a public letter attacking Johnson's ruling. Johnson responded to the letter in a second published opinion. Johnson said he was reluctant to be drawn into public controversy, but felt compelled to do so:

> But when a bias is attempted to be given to public opinion by the overbearing influence of high office, and the reputation of ability and information, the ground is changed; and to be silent could only result from being borne down by weight of reasoning or awed by power.

Johnson went on to repeat his insistence on judicial power to control executive action.

Justice Johnson's observations are particularly relevant in the present case: the intent to issue a pardon was announced at a rally, with rhetorical flourishes designed to excite passion and prejudice about the issues in these cases.

The views of Marshall, Cranch and Johnson about judicial duty reflected Anglo-American history dating to the 1600s. We have noted above some of the legal, historical, and ideological underpinnings of judicial power. For a thorough examination of these questions, as they arose at common law and therefore influenced our own Constitution, *see* Stephen Sedley, Lions Under the Throne (2015) (an edited version of Lord Justice Sedley's Oxford lectures on the history of English public law).

The American colonists chafed under royal (executive) decrees that interfered with judicial independence. The Declaration of Independence charged that the King "obstructed the administration of justice by refusing his assent to laws for establishing judiciary power. He has made judges dependent on his will alone for the tenure of their office and the amount and payment of their salaries." *See also* Joseph H. Smith, An Independent Judiciary: The Colonial Background, 124 U. Penn. L. Rev. 1104 (1976).

## VI. THE SECOND PRINCIPLE – INHERENT JUDICIAL POWER

During the debates over the proposed constitution, Patrick Henry feared that the judicial branch would not be equal to its assigned task of upholding the law in the face of executive bullying:

> If your American chief be a man of ambition and abilities, how easy is it for him to render himself absolute! The army is in his hands, and if he be a man of address, it will be attached to him, and it will be the subject of

> long meditation with him to seize the first auspicious moment to accomplish his design, and, sir, will the American spirit solely relieve you when this happens? I would rather infinitely—and I am sure most of this Convention are of the same opinion—have a king, lords, and commons, than a government so replete with such insupportable evils. If we make a king we may prescribe the rules by which he shall rule his people, and interpose such checks as shall prevent him from infringing them; but the president, in the field, at the head of his army, can prescribe the terms on which he shall reign master, so far that it will puzzle any American ever to get his neck from under the galling yoke. I can not with patience think of this idea. If ever he violate the laws, one of two things will happen: he will come at the head of the army to carry everything before him, or he will give bail, or do what Mr. Chief Justice will order him.

Henry Steele Commager, ed., 1 Documents of American History (H.S. Commager ed.) (1944) 147.

Alexander Hamilton, in more measured tones, recognized the potential problem, but believed that life tenure would be a bulwark against undue impositions. He wrote in Federalist No. 78:

> This independence of the judges is equally requisite to guard the Constitution and the rights of individuals from the effects of those ill humors, which the arts of designing men, or the influence of particular conjunctures, sometimes disseminate among the people themselves, and which, though they speedily give place to better information, and more deliberate reflection, have a tendency, in the meantime, to occasion dangerous innovations in the government, and serious oppressions of the minor party in the community.

In this connection, note also Justice Johnson's deliberate rebuke to Jefferson's attempt to control judicial proceedings – a rebuke all the more significant because Jefferson had nominated Johnson to the Court.

Marshall's ruling, Henry's concerns, and Hamilton's counsel refer to the judiciary's most important duty: to act as a "counter-majoritarian" check on excesses threatened or committed by the coordinate branches of government. This does not mean that the courts have the discretionary power or duty to frustrate the popular will. The judiciary's counter-majoritarian functions are most often used in ways that foster and support the fundamental values of democratic government. These values include, for example, the rights of all persons regardless of race, ethnicity, gender, and sexual orientation to participate in and benefit from equal rights. In this very case, one

fundamental value at stake is the right to even-handed treatment at the hands of law enforcement – surely a democratic value.

We submit that when it fulfills this counter-majoritarian role, the court has its highest and best claim to resist interference by the coordinate branches.

**VII. INHERENT JUDICIAL POWER, AND THE PARDON POWER**

As shown above, only the Congress has constitutional power to create and define an "Offense." The Constitution uses several different terms to describe penal laws: "Piracies and Felonies," "Offenses," "Crimes."

The Constitution, as interpreted from the Republic's earliest days, makes a crucial distinction: The federal courts have power to try "crimes," which can be created only by the legislative branch. That is, there are no "common law crimes" in the federal system. Thomas Jefferson's assertions to the contrary, in an effort to get at his enemies by prosecutions for criminal libel, were rejected by the Supreme Court in *United States v. Hudson*, 11 U.S. 32, 34 (1812). Justice Johnson, speaking for the Court, wrote that "[t]he legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the court that shall have jurisdiction of the offense." *Id.* Note the use of the term "offense" in this passage.

Justice Johnson then drew a sharp distinction:

> Certain implied powers must necessarily result to our courts of justice from the nature of their institution. But jurisdiction of crimes against the state is not among those powers. To fine for contempt -- imprison for contumacy -- enforce the observance of order, &c., are powers which cannot be dispensed with in a court, because they are necessary to the exercise of all others, and so far our courts no doubt possess powers not immediately derived from statute; but all exercise of criminal jurisdiction in common law cases we are of opinion is not within their implied powers.

*Ibid*.

This power of contempt was recognized in the Judiciary Act of 1789, 1 Stat. 73. In § 9 of the Act, the federal district courts were given power to try "crimes and offences." Separately, in § 17, the Act recognized the power "to punish by fine and imprisonment, at the discretion of said court, all contempt of authority in any cause or

hearing before the same." That is, the inherent contempt power was not thought to be part and parcel of the power to try those accused of crime.

In 1831, the Congress prescribed certain limits on the contempt power, enacting what is now codified to 18 U.S.C. § 401 and § 1503. An Act Declaratory of the Law Concerning Contempts of Court, 4 Stat. 487. The statute was a reaction to the controversy surrounding Judge James H. Peck and his use of the contempt power. ***See generally*** https://en.wikipedia.org/wiki/James_H._Peck. This statute did not derogate from the inherent power of courts, but rather defined that power.

Thus, the constitutional structure, and the legislation passed by the First Congress, recognize this important distinction: there are crimes, felonies and offenses, defined by the legislature. Legislative enactment is a precondition to any prosecution. On the other hand, there are contempts, the punishment of which is within the inherent judicial power. The pardon power logically and textually refers only to the former category.

The facts of *Grossman* bear out this analysis. The proceedings against Grossman were based on Congressional creations of criminal offenses, the prosecution of which had "abatement" enforcement as an auxiliary remedy.

The Supreme Court reaffirmed the inherent power of district courts to enforce compliance in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). Chambers was sued, related to the sale of a broadcast station. He and his counsel engaged in conduct designed to impede the orderly resolution of the case. The district judge imposed a $1 million sanction, but did not rely on statutory authority under 28 U.S.C. § 1927 or Fed. R. Civ. P. 11. The Supreme Court held that federal courts have an inherent power to protect their processes. The Court traced the history of "inherent power," and relied on many of the authorities cited in this memorandum.

The "inherent power" analysis is particularly important in cases like this. Yes, there would be a public purpose served by charging Mr. Arpaio with a crime and vindicating the public interest in that way. But Mr. Arpaio's consistent conduct, if

tolerated, undermines this court's constitutional right and duty to protect its *own* processes and the lives and liberty of those who come to seek justice. Once, in their Supreme Court pleading, lawyers in the Trump executive department recognized this distinction and relied on it. Their credibility may fairly be questioned if they change course now.

As noted above, it is purely adventitious that the United States prosecuted Arpaio using its own personnel, which might give an inattentive observer the false impression that this is an ordinary criminal case. The district judge has the inherent power to appoint a special prosecutor to bring contempt charges. As the Court held in *Young v. United States ex rel. Vuitton et Fils*, 481 U.S. 787, 795 (1987):

> [Fed.R.Crim.P. 42(b)'s] assumption that private attorneys may be used to prosecute contempt actions reflects the longstanding acknowledgment that the initiation of contempt proceedings to punish disobedience to court orders is a part of the judicial function. . . . As this Court declared in *Michaelson v. United States ex rel. Chicago*, St. P., M., & O. R. Co., 266 U. S. 42 (1924):
>
> > "That the power to punish for contempts is inherent in all courts, has been many times decided and may be regarded as settled law. It is essential to the administration of justice. The courts of the United States, when called into existence and vested with jurisdiction over any subject, at once became possessed of the power."

This holding again underscores the inviolable nature of the contempt power and its distinction from the power to try persons accused of crime. Indeed, a contempt case of this kind is perhaps the closest modern analogue to the historic appeal of felony.

## VIII. CONCLUSION

Few Presidents have questioned their duty to enforce judicial decrees affecting private rights. We can reflect on several of our nation's proudest moments when Presidents have stepped in to support the federal courts. In 1957, President Eisenhower ordered the military and National Guard to end Arkansas governor Faubus's resistance to school segregation. In 1962, President Kennedy sent troops and U.S. Marshals to escort James Meredith into the University of Mississippi.

An historic instance of law defiance by a sheriff repays study in this context. In 1906, Ed Johnson, an African-American, was condemned to death in Chattanooga, Tennessee. Supreme Court Justice Harlan granted a stay of execution pending federal review of the case, and remanded Johnson to Sheriff Shipp's custody. Shipp conspired with others to allow a mob to take Johnson from the jail and lynch him. President Theodore Roosevelt expressed outrage at this defiance of federal court authority. Shipp was prosecuted for and convicted of contempt of the Supreme Court – the only "trial" ever held before that Court. He was sentenced to imprisonment. *United States v. Shipp*, 203 U.S. 563 (1906), 214 U.S. 386 (1909); *see* Mark Curriden, Contempt of Court: The Turn-of-the-Century Lynching That Launched a Hundred Years of Federalism (1999). No President till now has proclaimed that a public official who violated the Constitution and flouted court orders was "doing his job." The purported pardon is an attempt to exercise a power that even the King of England did not possess in 1787. By that time, the English people had rejected what Madison termed the "impious doctrine of the Old World that people were made for Kings and not Kings for people." Federalist No. 45.

We respectfully submit that this Court should hold the purported pardon invalid.

DATED this 11th day of September, 2017.

OSBORN MALEDON, P.A.

By s/ Larry A. Hammond
Larry A. Hammond
Joshua D. Bendor
2929 N. Central Ave., Suite 2100
Phoenix, Arizona 85012-2793

Attorneys for Erwin Chemerinsky, Michael E. Tigar, and Jane B. Tigar

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

s/ Karen Willoughby